LYNCH vs. THE EASTERN, LA FAYETTE & MISSISSIPPI RAILWAY COMPANY and others, imp

*November 1, 1882 — May 31, 1883.*

INJUNCTION. *(1)* Who may maintain action to restrain delivery of town bonds.
RAILROADS: MUNICIPAL AID. *(2)* Form of submitting question to electors. *(3)* Limitation of time for completing road. *(4)* Construction of road by assignee: contract construed.
CORPORATIONS. *(5, 6)* When change in purpose releases subscribers to stock. *(7)* Subscriptions enforced although whole amount not subscribed for. *(8)* Worthlessness of stock no defense.

1. A tax-payer of a town may maintain an action on behalf of himself and other tax-payers to enjoin the delivery of bonds unlawfully issued by the town authorities.

Lynch vs. Eastern, La Fayette & Mississippi R'y Co. and others, imp.

2. Where the only object of the electors of a town in granting aid to a railway company is to procure the construction of a railway from a certain point to such town, the question may be submitted to them in such a form as to provide that the aid shall be given to that one of two companies which shall first complete its road between such points.

3. Where a contract for the issuance of bonds in aid of a railway company did not limit the time within which the road should be completed, and no notice was given by the town that unless it was completed within a reasonable time the aid would not be furnished, the company does not lose its rights under the contract by lapse of time or by the statute of limitations.

4. It was understood by the railway company, by the town authorities, and by the electors when they voted to grant aid, that the road might be built by an assignee of the company, and the original contract made by the town provided that the aid should be given to that one of two companies which should "by itself or its assignee" first complete the road. In a subsequent contract, which was intended to revive the original contract as between the town and the defendant company and to limit the time of performance, the condition of the aid being given was that the railroad should be "constructed by the said party of the second part [the company]" before a certain time, nothing being said as to the construction of the road by an assignee. The road was, in fact, completed by an assignee of the company, and the town authorities construed this to be a performance of the contract. In an action by a tax-payer to enjoin the delivery of bonds of the town issued in pursuance of the second contract, *held* that the defendant company was not required, in order to earn the aid, to complete the road itself.

5. The object of a corporation, at the time of a subscription to its capital stock, was to build a railroad between certain points. It caused a portion of such road to be built, and transferred to another company the right to operate such portion, retaining, however, all its rights and franchises to build the remaining portion of the road. *Held*, that there was no such fundamental change in the purpose of the corporation as would release those subscribers to the stock who did not assent thereto.

6. If a subscriber for stock contemplated that a change would be made in the object and purpose of the corporation, he cannot, on the ground of such change, avoid his subscription.

7. Where the act incorporating a company does not provide that it shall have no power to act as a corporation until a certain amount

of stock is subscribed for, a subscription which is not made dependent upon any such condition may be enforced although the whole amount of stock authorized to be issued has not been subscribed for.

8. In the absence of fraud it is no defense to an action to recover upon a valid subscription to the stock of a corporation that the stock subscribed for is valueless.

LYON and ORTON, JJ., dissent, the latter being of the opinion that the only ground upon which town aid to a railway can be sustained is that the town receives an adequate pecuniary consideration therefor beyond the general benefits of the road; and that the stock of a railway company is such consideration only when, at the time it is received by the town, it is based upon and represents the *railway itself* passing through such town and to build which the aid was voted.

APPEAL from the Circuit Court for *La Fayette* County. The case is stated in the opinion.

For the appellant there was a brief by *Orton & Osborn*, and oral argument by *Mr. Orton*. They contended, *inter alia:*

1. By the contract of July 20, 1880, the subscription of the town was conditioned that *the defendant railway company* should, by the use of its capital stock and its credit, build a certain road. When this road was built, then the company would take the bonds, and the town would take the stock, which would give it an interest in the road. This condition is a valid one; the town is bound if the condition is performed and released if it is not. 1 Redf. on Railways (4th ed.), 171, 177, notes 6, 7; *Oldtown & Lincoln R. R. Co. v. Veazie*, 39 Me., 571; *Penobscot & Kennebec R. R. Co. v. Dunn*, id., 587; *Racine Co. Bank v. Ayres*, 12 Wis., 512; *Kenosha, R. & R. I. R. R. Co. v. Marsh*, 17 id., 13; *Lawson v. Schnellen*, 33 id., 288. There has been no compliance with the condition. The defendant company has assigned the town bonds, to which it is not entitled until it builds its road from Monroe to Shullsburg, to the Chicago, Milwaukee & St. Paul Railway Company, as a gift or bonus, in

consideration of which that company has constructed a road in which the town has no interest or stock whatever. The certificate of stock tendered by the defendant company represents no interest in the road and is valueless. It is not contended that stock subscriptions are not assignable, but only that the assignee shall stand in no better attitude than the assignor — that the assignment shall not set aside a condition of the subscription. The most that the C., M. & St. P. Railway Company ought, in justice, to ask of the town, is that it exchange its bonds for the stock of that company, and it has no legal right to demand that. *West End R. R. Co. v. Dameron*, 4 Mo. App., 414. An authority given to a municipality to subscribe to the capital stock of one railway company, does not authorize such subscription to be made to the stock of a consolidated company, made up in part of the original company. *Harshman v. Bates Co.*, 92 U. S., 569; *County of Bates v. Winters*, 97 id., 83; *State v. Garroutte*, 67 Mo., 445.

If, by the terms of the contract of July 20, 1880, the town must deliver its bonds and take the worthless stock of the defendant company, which has no property and no existence, then the contract is void because a tax to pay the bonds is, in that case, an unlawful and unconstitutional exercise of the taxing power, under the principle established in *Whiting v. S. & F. du L. R. R. Co.*, 25 Wis., 167. The town cannot do indirectly what it is forbidden by the fundamental law to do directly. The constitutional requirement is that the money of the tax-payer, if taken for railway construction, must be applied in such a way as to give him a direct interest in the railway.

2. When the number of shares and the amount of the capital stock of a corporation is fixed by its charter or by action of its directors, there is an implied agreement with the subscribers that no assessment or calls upon them shall be made until the full amount of stock is subscribed. 1 Redf.

on Railways (4th ed.), 176; Pierce on Railroads, 67; *Cabot & W. S. Bridge v. Chapin*, 6 Cush., 50; *Worcester & N. R. R. Co. v. Hinds*, 8 id., 110; *Stoneham Branch R. R. Co. v. Gould*, 2 Gray, 277; *Katama Land Co. v. Jernegan*, 126 Mass., 155; *N. H. Central R. R. Co. v. Johnson*, 10 Foster, 390. The amount of the capital stock of the defendant company is fixed by its charter (sec. 15, ch. 487, P. & L. Laws of 1871) at $500,000, divided into shares of $100 each. Of this stock only 698 shares were ever subscribed for, including all conditional subscriptions.

For the respondents there was a brief by *John W. Cary*, and oral argument by *Moses M. Strong* and *Mr. Cary*.

TAYLOR, J. This action is brought by the appellant, a resident and tax-payer of the town of Gratiot, La Fayette county, against the defendant railway company, the town board of supervisors and the town clerk of said town, and *Hans B. Warner*, late secretary of state of Wisconsin, to enjoin perpetually the delivery to the defendant railway company or to its assignee of thirty bonds, each for the sum of $500, of the town of Gratiot, issued by the town board of supervisors and clerk to the defendant railway company, in aid of the construction of a railway to be built by it from Monroe, in Green county, to Shullsburg, in La Fayette county, and to compel the cancellation of said bonds. The action was commenced on the 13th day of September, 1881. A temporary injunctional order was issued by the county judge of La Fayette county on the 13th of September, in accordance with the prayer of the complaint, and was served with the summons and complaint on the defendants. The defendants, except the secretary of state, answered. A motion to dissolve the temporary injunctional order was made by the defendants, argued, and such order was dissolved by the court, on the 25th day of October, 1881, and the a    l to this court is taken from the order of dissolution,    the

plaintiff gave the necessary undertaking to continue the injunctional order pending this appeal.

The pleadings and proofs presented to the circuit court on the motion to dissolve the injunction, present the case apparently upon its merits, and the order dissolving the temporary injunction was undoubtedly made by the court below upon the merits of the plaintiff's cause of action as it appears from the pleadings and proofs offered on the hearing of the motion, and not upon any irregularities or errors in practice. There is no serious contest made in this case, on the part of the learned counsel for the respondents, that the plaintiff may not maintain the action as a tax-payer of the town on behalf of himself and other tax-payers therein; and we have no doubt as to his right to maintain such action if the bonds, the delivery of which he seeks to enjoin, were unlawfully issued by the town authorities. This right to maintain the action is settled by this court in the cases of *Lawson v. Schnellen*, 33 Wis., 288; *Whiting v. S. & F. du L. R. R. Co.*, 25 Wis., 167; *Peck v. School District*, 21 Wis., 520; *Phillips v. Town of Albany*, 28 Wis., 340.

We must, therefore, consider the case upon its merits as presented by the record, and determine whether, upon the facts appearing from the pleadings and the proofs introduced upon the motion to dissolve the temporary injunction, the town board of the town of Gratiot had lawful authority to issue said bonds and deliver the same to the defendant railway company or its assignee. The material facts, as shown by the pleadings and proofs, are as follows:

In 1871 the Dubuque, Platteville & Milwaukee Railway Company had been organized as a Platteville enterprise, to secure the construction of a railroad from Dubuque by way of Platteville to Monroe, the then terminus of the Chicago, Milwaukee & St. Paul Railway westward from Milwaukee. Its contemplated route was from Monroe to the village of Gratiot, in the town of Gratiot; from there, following the

line of the then Mineral Point Railway, to the village of Calamine; then to Platteville over the portion of its line then constructed and in operation; and ultimately from Platteville to the Mississippi river at Dubuque.

The defendant railway company, the *Eastern, La Fayette & Mississippi Railway Company*, had been also organized at that time as a Shullsburg enterprise, contemplating the construction of a railway from Monroe by the way of Gratiot to Shullsburg, and ultimately to Dubuque. The foregoing statement of the purposes and objects of the two railway corporations is taken from the brief of the learned counsel for the appellant, and we have no doubt of its accuracy, nor is its accuracy questioned by the counsel for respondents.

The *Eastern, La Fayette & Mississippi Railway Company* was incorporated by ch. 487, P. & L. Laws of 1871, which contained the following provisions in respect to receiving aid from the towns, cities, and villages on its line:

"Sec. 16. The several towns, villages, and cities upon or contiguous to the line of said road, by this act authorized to be constructed, as the same may hereafter be located and established, are, and each of them is, hereby authorized to aid in the construction of said railroad by subscribing to the stock of the company and paying for the same by issuing bonds to said company in payment for said stock, and levying taxes to pay the interest as it accrues upon said bonds, and to establish a sinking fund for the gradual redemption and ultimate full redemption of said bonds at maturity; and for these purposes the board of supervisors of such towns, the board of trustees of such villages, and the common councils of such cities, respectively and severally, shall have power to negotiate and arrange the terms and conditions upon which such aid shall be granted, to enter into all proper contracts with said company in relation to the same, and to adopt such ordinances pertaining thereto, or to the taxes to be levied under this act, as may be expedient and

proper and consistent with the law: *provided*, that before any such aid shall be granted or contracted for by any such town, village, or city, the question of granting the same shall be submitted to a vote of the electors thereof, respectively, as hereinafter provided.

" Sec. 17.   Whenever the president and secretary of the said *Eastern, La Fayette & Mississippi Railway Company* shall certify, under their hands and the seal of the said company, to the authorities of any such town, village, or city that the route of said railroad has been located through or contiguous to such town, village, or city, it shall be the duty of the authorities thereof, hereinbefore mentioned, to call a special election to determine the question whether aid shall be granted to the said company in the manner prescribed in the preceding section of this act.   Such election shall be called, notice thereof shall be given, the form of ballot shall be prescribed, and all regulations relating to the same be determined, by the proper authorities, hereinbefore mentioned, of such towns, villages, and cities, so that the question be fairly submitted to a vote of the electors.   In case, at any such election, a majority of votes shall be against granting such aid, the proper authorities may afterwards, in their discretion, call another election upon the same subject, and the same shall be conducted in a like manner, but no more than two elections shall be held in any one town, village, or city under this act.

" Sec. 18.   If, at any election authorized by this act, any such town, village, or city shall vote in favor of granting such aid, by a majority of the votes cast at such election, *then the authorities thereof shall have and exercise, in their discretion, the powers conferred upon them by the preceding sections of this act*, and all contracts made by them, by virtue thereof, shall be valid and enforceable, according to the true intent and meaning thereof."

And by ch. 457, P. & L. Laws of 1867, the same powers

in regard to receiving aid from the towns, cities, and villages on the line of its road were conferred upon the Dubuque, Platteville & Milwaukee Railway Company. The language of ch. 457, P. & L. Laws of 1867, is almost identical with the language of secs. 16, 17, 18, ch. 487, P. & L. Laws of 1871.

As is said by the learned counsel for the appellant: " So it came about that on the 1st day of August, 1871, each of these companies was solicitous that the town of Gratiot (which had no special interest in the different and diverging routes of the two roads westward from Gratiot, but had a special interest that one or the other of the companies should construct its road to Gratiot from Monroe) should aid in the construction of its road from Monroe to Gratiot; and on that day the two companies submitted to the town, and filed in the town clerk's office, the following double-headed or joint proposition, to wit:

" *State of Wisconsin, County of La Fayette, ss.*— To the Board of Supervisors of the Town of Gratiot, in said County : It is hereby certified by the president and secretary of the *Eastern, La Fayette & Mississippi Railway Company*, under their hands and the seal of the said company, and it is hereby certified by the president and secretary of the Dubuque, Platteville & Milwaukee Railway Company, under their hands and the seal of said company, that the route of each of said railroads has been located from the village of Monroe, in the county of Green, in said state, thence westwardly through the said town of Gratiot; and the said railroad companies do hereby jointly and severally request the said board of supervisors of the said town of Gratiot to submit, in due form of law, to the qualified voters of said town, at an election to be held in the said town for the purpose, the question whether the said town will aid in the construction of said railroad by subscribing *and paying for one hundred and fifty shares of the capital stock of that one of the said companies, by itself or its assigns, that shall first construct,* build,

and run its cars over its said road from said Monroe to the Mineral Point Railroad, in the said town of Gratiot; said shares of stock amounting, at their par value, to the sum of fifteen thousand dollars.

"In testimony of all which, the board of directors of each of the said companies have caused the president and secretary of each of the said companies to hereto affix their hands, and the corporate seal of each of the said companies hereunto, the 1st day of August, 1871.

"EDWARD MELOY, President,

[L. s.]              "JOHN K. WILLIAMS, Secretary,

"Of the *Eastern, La Fayette & Mississippi Railway Co.*

"H. ROBBINS, President,

[L. s.]              "JAMES MOORE, Secretary,

"Of the Dubuque, Platteville & Milwaukee Railway Co."

On the 2d day of August the town board of supervisors of the town of Gratiot met at the office of the town clerk of said town, and adopted and passed a certain order or resolution relative to said proposition from said railway companies.   The following is a copy thereof:

"The president and secretary of the *Eastern, La Fayette & Mississippi Railway Company* and the Dubuque, Platteville & Milwaukee Railway Company, each having certified under their hands and the corporate seal of each of the said companies, under date of August 1, 1871, to the board of supervisors of said town of Gratiot, in the county of La Fayette, in the state of Wisconsin, that the route of the railroad of each of the said companies has been located through the said town, and the said railroad companies having in writing jointly and severally requested the said board of supervisors of the said town to submit to the qualified electors thereof, at an election to be held, and held therein for that purpose, the question whether the said town will aid in the construction of the said railroad by subscribing and paying *for one hundred and fifty shares of the capital stock of that*

*one of the said companies that shall, by itself or its assigns, first build, construct,* equip, and complete a railroad from the village of Monroe, in the county of Green, in the said state of Wisconsin, thence westwardly to the Mineral Point Railroad, in the said town of Gratiot, said shares of stock amounting at their par value to the sum of $15,000:

"Now, therefore, it is hereby ordered by the said board of supervisors of the said town of Gratiot, that a special election in the said town of Gratiot be and is hereby called to be held at the town clerk's office in the village of Gratiot, on the 19th day of August, 1871, to determine whether aid will be granted by the said town in pursuance of the request aforesaid of the said companies, and in conformity with the provisions of chapter 457 of the Private and Local Laws of the state of Wisconsin, passed in the year 1867; and of chapter 487 of the Private and Local Laws of the said state, passed in the year 1871. It is further ordered that the question to be submitted to the qualified electors of the said town, at the said election, shall be: Will the town of Gratiot aid in the construction of the said railroad of that one of the said companies that shall, by itself or its assigns, first build, construct, equip, and complete a railroad from said Monroe to said Mineral Point Railroad, in the said town of Gratiot, by subscribing for 150 shares of the capital stock of such company so first building said railroad, amounting at their par value to the sum of $15,000, and paying therefor the said sum of $15,000, in the manner and upon the terms and conditions following, that is to say: The amount of such aid that may be so voted by the said town shall be taken and given by the said town *by its subscribing for the said 150 shares of the capital stock of that one of the above companies that shall, by itself or its assigns, first build,* equip, construct, and complete a railroad from the said village of Monroe, thence westwardly to such point in the said town on the said Mineral Point Railroad, at or near the village of Gratiot, or

Lynch vs. Eastern, La Fayette & Mississippi R'y Co. and others, imp.

Riverside, as the engineers of such company so building the said road shall determine as the most feasible?

"The said town shall pay for the 150 shares of stock so to be subscribed, in fifteen bonds of the said town of Gratiot, each bond to be for $1,000, at par value, and shall be made payable as follows, that is to say: Said bonds are to be made payable within fifteen years from the day of delivery thereof, and shall be conditioned that the said town shall have the option to pay any or all of the said bonds in full, on the 1st day of April in any year, upon giving notice at the said bank six months prior to the time of such intended payment, and the interest and principal thereof shall be payable at the Metropolitan National Bank, in the city of New York. Said bonds are to bear interest, to be paid annually, at the rate of seven per centum per annum, with interest coupons attached, and to be computed from the date of delivery thereof, and shall be signed by the chairman of the board of supervisors of the said town, and attested by the clerk thereof, and shall be delivered to the president *of that one of the above-named railroad companies, or its assigns, that shall, by itself or its assigns, first build, equip, complete, and put in running order said railroad between the termini aforesaid;* and such bonds are to be delivered by the said town to such company as soon as the cars shall be running on its road from Monroe to the said designated point in the town of Gratiot, and not previous to that time; and it is further ordered by the said board of supervisors of the said town of Gratiot, that notice of the said election shall be given by the town clerk of the said town, by posting up notices in the following or equivalent form, in three public places in the said town, at least fifteen days before the said day of election; and that the said election shall be held and conducted in the same manner as judicial elections are held and conducted, except that it shall not be necessary to make any

return thereof except one to be filed in the office of the town clerk of the said town; that the form of ballot to be used at the said election shall be, 'For aid to the railroad,' and 'Against aid to the railroad;' and if a majority of the votes cast at the said election shall be in favor of aid to the railroad, then the said town, by its said board of supervisors, will and shall subscribe and pay for the said capital stock in the manner and upon the conditions and terms in this order above provided, and not otherwise; and that the form of the notice of such election so to be given as above provided, shall be in the following or equivalent form."

At an election held in said town on the 19th day of August, 1871, to vote upon said proposition, a majority of all the votes cast at said election were cast in favor of aiding the construction of said railroad. The notice for such election set forth, in substance, the joint proposition of said two companies.

· The plaintiff, in his complaint, alleges "that the only object sought to be attained by the voters of the town of Gratiot, and the only inducement which influenced them to vote the said aid to the said railway companies making said proposition, was the construction of a railway from Monroe westerly to the village of Gratiot, thereby securing to the residents of said town direct railway communication with the city of Milwaukee, and the numerous great commercial advantages sure to result from such communication. Both of the said railway companies making such joint proposition to said town, professed their readiness to build said railway from Monroe to Gratiot, and contended with each other which should first construct the same." This allegation is admitted by the defendants in their answer.

Immediately after the vote had been taken in said town of Gratiot, the town of Gratiot made the following contract with said two railway companies:

"Town of Gratiot, County of La Fayette, State of Wisconsin, with the *Eastern, La Fayette & Mississippi Railway Company*, and Dubuque, Platteville & Milwaukee Railway Company:

"Whereas, the *Eastern, La Fayette & Mississippi Railway Company*, under the hands of the president and secretary, and the seal of said company, having certified to the authorities of the town of Gratiot that they have located the route of their railroad through the town of Gratiot; and the Dubuque, Platteville & Milwaukee Railroad Company, under the hands of their president and secretary and the seal of said company, having also certified to the authorities of the said town of Gratiot that they have located the route of their railroad through the said town of Gratiot; and whereas, the presidents and secretaries of said companies having negotiated with the authorities of said town, to wit, the supervisors thereof, and having arranged with them the terms and conditions upon which aid should be granted by the town of Gratiot in the construction of a railroad from Monroe, in the county of Green, westwardly, through the town of Gratiot, to the Mineral Point Railroad, and as to the amount of such aid, as authorized by chapter 487 of the Private and Local Laws of the state of Wisconsin for the year 1871, and chapter 457 of the Private and Local Laws of said state for the year 1867, and having agreed that the amount of such aid be fixed at the sum of $15,000; and whereas, in pursuance of the provisions of said chapters 487 and 457, a special election was ordered to be called by the town clerk of said town of Gratiot, by the supervisors thereof, to vote upon the question of granting such aid; and whereas, such special election having been duly called and notified by said town clerk, and having been duly held at the usual place of holding elections in said town of Gratiot, on the 19th day of August, 1871; and whereas, at such election, a majority

of all the votes cast upon such question were in favor of granting such aid: Now, therefore, in further pursuance of chapters 487 and 457 aforesaid, it is hereby agreed and contracted that in view of the benefits and advantages which will inure to the town of Gratiot from the construction of a railroad from Monroe, in the county of Green, westwardly through the town of Gratiot to the Mineral Point Railroad, that the said *town of Gratiot shall aid that one of the before-named railroad companies which shall, by itself or its assignee, first build, construct,* and equip a railroad from Monroe, in the county of Green, westwardly through the said town of Gratiot to the Mineral Point Railroad, at a point at or near to the village of Gratiot, or at or near to the village of Riverside, in the county of La Fayette, by subscribing and paying for 150 shares of the capital stock of such company, amounting at their par value to the sum of $15,000, in the manner following, that is to say: Whenever such railroad shall have been completed the whole distance between the *termini* named, and the cars shall be running upon it, the authorities of the said town of Gratiot shall make the subscription to the capital stock of such company to the amount stated, and, in payment thereof, shall make, execute, and deliver to the president of said company, or their assigns, fifteen bonds of said town, to be signed by the chairman, and attested by the town clerk thereof, numbered from 1 to 15, inclusively, for the sum of $1,000 each, in all for the sum of $15,000, bearing seven per cent. per annum interest, which shall be payable annually on the 1st day of April at the Metropolitan National Bank in the city of New York, and having interest coupons attached; the principal of said bonds to be also payable at the said Metropolitan National Bank in the city of New York in fifteen years from their delivery, which time they shall bear date; each of said bonds to contain a provision reserving to said town of Gratiot the option to pay the

same on the 1st day of April in any year before its maturity, upon having given six months' previous notice at said Metropolitan National Bank of such intended payment.

"Witness the hands of the supervisors of the said town of Gratiot, attested by the town clerk thereof, and the hands of the presidents and secretaries of the said *Eastern, La Fayette & Mississippi Railway Company*, and the Dubuque, Platteville & Milwaukee Railway Company, under the seals of said companies, the 19th day of August, 1871."

"(Executed in triplicate.)"

Nothing was done by either of said railway companies towards building said railway from Monroe to Gratiot from the time of making said contract until some time in the year 1880, except that the defendant company had procured some right of way and procured the voting of aid from other towns on the line of its road. During this interval the said defendant railway company had, from time to time, negotiations with the Chicago, Milwaukee & St. Paul Railway Company to induce such company to construct the road from Monroe to Gratiot as assignees of said defendant company. No progress was made in these negotiations until some time in June, 1880, and after the Chicago, Milwaukee & St. Paul Railway Company had purchased the Mineral Point Railway. Then, and on or about June 30, 1880, an oral contract, and subsequently, on December 29, 1880, the following written contract, was entered into between the defendant railway company and the Chicago, Milwaukee & St. Paul Railway Company:

"This agreement, made this 29th day of December, 1880, by and between the Chicago, Milwaukee & St. Paul Railway Company, a corporation duly formed and organized under and by virtue of the laws of the state of Wisconsin, party of the first part, and the *Eastern, La Fayette & Mississippi Railway Company*, a corporation duly formed and

authorized under and by virtue of the laws of the same state, party of the second part:

"Whereas, the said party of the second part has a charter for the construction of a railway from Monroe, in the county of Green, through the counties of La Fayette and Grant to the Mississippi river, and has located its said line of railway from said Monroe to Shullsburg, and, with a view of constructing said railway, has made divers contracts for right of way, and has procured several towns along the line of said proposed line of railway to vote aid thereto, as follows: The town of Shullsburg, $22,900; town of Seymour, $5,000; town of Gratiot, $15,000; town of Wayne, $10,000; town of White Oak Springs, $5,000; town of Wiota, $6,000; town of Cadiz, $5,000,— for the amount of which aid the said several towns, excepting the towns of Cadiz and White Oak Springs, have executed their bonds and said company has issued its stock, all of which said bonds and stock have been deposited in escrow with the secretary of state of Wisconsin to be delivered — the said bonds to said company or its assigns and said stock to the said towns, respectively, upon the completion of said railway from said Monroe to the village of Shullsburg, in La Fayette county, on or before the 1st day of October, 1881; and has also procured, as a bonus, promissory notes amounting to $9,100, payable on the said 1st day of October, 1881, conditioned that said railroad shall be complete and in operation on or before that day from said Monroe to Shullsburg; and whereas, the said party of the second part is unable to complete said railway to Shullsburg by said 1st day of October, 1881, and the said party of the first part is willing to undertake the completion thereof, and will make favorable connections with the railway of the said *Eastern, La Fayette & Mississippi Railway Company* for its railway when completed from Shullsburg west to the Mississippi river, which will greatly

aid said party of the second part in completing the same west of said Shullsburg to said Mississippi river:

" Now, therefore, this agreement witnesseth, that the said party of the second part, in consideration of the premises and of the sum of one dollar to it in hand paid, the receipt whereof is hereby acknowledged and confessed, has granted, bargained, sold, and transferred, and by these presents does grant, bargain, sell, and transfer, unto said party of the first part, its said line of railway and right of way, and all of its contracts for right of way, to that portion of said proposed road lying between Monroe and the village of Shullsburg, together with all the right, title, and franchise now possessed by said party of the second part, to build and construct said road from Monroe to Shullsburg; and also has granted, bargained and sold, transferred, and assigned, and by these presents does grant, bargain, sell, transfer, and assign, to the said party of the first part, all the bonds heretofore issued to said party of the second part by the several towns of Shullsburg, Seymour, Gratiot, Wayne, and Wiota, in the county of La Fayette, in aid of the construction of said railway, and now on deposit in escrow with the secretary of state of Wisconsin; and has also sold, transferred, and assigned, and by these presents does sell, transfer, and assign, to the party of the first part the sum of $5,000 subscribed by the town of White Oak Springs, and $5,000 subscribed by the town of Cadiz, to the construction of said railway, and which amounts have heretofore been severally voted by said towns in aid thereof, together with the sum of $9,100 in notes heretofore given by divers parties to said party of the second part to aid in the construction of said railway, and now held by the party of the second part; and the said party of the second part does hereby authorize the said party of the first part, on the completion of said railway to the said village of Shullsburg, on or before the 1st day of October, 1881, to

demand of and receive from the said secretary of state all of said bonds so deposited with him to aid in the construction of said railway, for its own use and benefit, and to demand, receive, and collect, for its like use and benefit, the subscriptions heretofore made by said towns of White Oak Springs and Cadiz, and to collect and receive the amounts of the said several notes from the makers thereof, which said notes are herewith delivered to the said party of the first part.

"*Second.* The said party of the first part, in consideration of the foregoing agreement, agrees to construct and complete said. railway from the said village of Monroe to the village of Shullsburg, and to put the same in operation as a railway on or before the 1st day of October, 1881.

" *Third.* The same party of the first part further agrees with said party of the second part that whenever said *Eastern, La Fayette & Mississippi Railway Company* shall construct the balance of its railway from the said village of Shullsburg to the Mississippi river, the said party of the first part will make with it a traffic contract, by which said party of the first part shall receive all freight and passengers bound eastward from Shullsburg, and which shall be brought thereto by the said party of the second part, and will deliver to said party of the second part all freight and passengers destined to any point on the railway of the *Eastern, La Fayette & Mississippi Railway Company*, from Shullsburg to Dubuque, and that compensation for carrying said freight and passengers shall be divided in proportion to the distance carried by each, and that in all respects just and equitable running arrangements shall be made between said companies.

"In witness whereof, the said parties have caused these presents to be executed in their corporate names, by their respective presidents, and sealed with their respective seals, and attested by their respective secretaries."

JANUARY TERM, 1883.                    449

Lynch vs. Eastern, La Fayette & Mississippi R'y Co. and others, imp.

On the 20th of July, 1880, the following contract was entered into between the town of Gratiot and the defendant railway company:

"Articles of agreement made and entered into this 20th day of July, 1880, by and between the town of Gratiot, county of La Fayette, and state of Wisconsin, party of the first part, and the *Eastern, La Fayette & Mississippi Railway Company*, party of the second part:

"Whereas, a tripartite agreement in writing was made and entered into on the 19th day of August, 1871, by and between the said party of the first part, said party of the second part, and the Dubuque, Platteville & Milwaukee Railroad Company, in and by which said agreement in writing it was agreed and contracted that in view of the benefits and advantages which would inure to the town of Gratiot from the construction of a railroad from Monroe, in the county of Green, westwardly through the town of Gratiot to the Mineral Point Railroad, *that the town of Gratiot should aid that one of the before-named companies which should, by itself or its assigns, first build*, construct, and equip a railroad from Monroe, in the county of Green, westward through the said town of Gratiot to the Mineral Point Railroad, by subscribing and paying for 150 shares of the capital stock of such company, amounting at par value to the sum of $15,000, in the manner following, that is to say:   Whenever the said railroad should have been completed the whole distance between the *termini* named, and the cars should be running upon it, the authorities of the said town of Gratiot should make the subscription to the capital stock of such one of said companies as should have constructed such railroad, to the amount stated, and in payment therefor should make, execute, and deliver to the president of said company, or their assigns, fifteen bonds of said town, to be signed by the chairman, and attested by the town clerk thereof, numbered from 1 to 15, inclusive, for the sum of $1,000 each, bearing

seven per centum per annum interest, which should be paya-
ble annually on the 1st day of April, at the Metropolitan
National Bank in the city of New York, and having inter-
est coupons attached.   The principal of said bonds to be
also payable at the said Metropolitan National Bank in the
city of New York in fifteen years from their delivery, which
time they should bear date — each of said bonds to contain
a provision reserving to said town of Gratiot the option to
pay the same on the 1st day of April in any year before its
maturity, upon having given six months' previous notice at
the said Metropolitan National Bank of such intended pay-
ment.   And whereas, it is understood by both of said par-
ties to this contract that the said Dubuque, Platteville &
Milwaukee Railroad Company has abandoned all intentions
of constructing a railroad from Monroe to the Mineral Point
Railroad or any part thereof, and that the second party to
this contract is now actually engaged in preliminary prepa-
rations for the commencement of the construction of such
railroad from Monroe, in Green county, westwardly through
the town of Gratiot to the Mineral Point Railroad at or
near the village of Gratiot, and expects that a considerable
portion of the grading of said railroad will be done during
the present year 1880, and that the construction of said rail-
road will be entirely completed between the said *termini,* so
as to admit the running of regular trains of cars over the
same by the 1st of October, 1881:

    "*Now, therefore, for the purpose of reviving and giving
new life to said tripartite contract, and limiting its operation
to the parties to this contract,* and thereby more effectively
aiding the said party of the second part in the construction
of said railroad, and in consideration of the benefits and ad-
vantages which will inure to the said town of Gratiot from
the early construction of said railroad, and in consideration
that the time within which said railroad shall be constructed
between said *termini,* and also be extended from the village

of Gratiot to the village of Shullsburg, so that said *Eastern, La Fayette & Mississippi Railway Company* shall become entitled to any aid whatever from said town, shall be limited to the 1st day of October, 1881; and in further consideration that the rate of interest on the bonds to be issued in liquidation of such aid shall be reduced to six per cent., it is hereby contracted and agreed that the board of supervisors of said town shall now make subscription to the capital stock of the *Eastern, La Fayette & Mississippi Railway Company* for 150 shares of said stock, amounting at par value to the sum of $15,000; and that in liquidation of such subscription said supervisors will cause to be issued thirty bonds of said town, payable to the *Eastern, La Fayette & Mississippi Railway Company* or bearer, each for the sum of $500, payable in fifteen years from the 1st day of April, 1880, bearing six per cent. interest, payable annually on the 1st day of April, the interest and principal, at the Wisconsin Marine & Fire Insurance Bank, in Milwaukee, Wis., with option to said town to pay the principal of any or all of said bonds on the 1st day of April of any year before its maturity, upon giving three months' previous notice to said bank of such intended payment; and the form of bond which has been now submitted is approved of, and said railway company agree to issue to said town a certificate for 150 shares of full-paid stock in said *Eastern, La Fayette & Mississippi Railway Company*, to and in the name of said town of Gratiot, amounting at par value to the sum of $15,000; and it is agreed that the thirty bonds of said town of Gratiot, and the certificate of 150 shares of stock hereinbefore provided to be issued to and in the name of the said town by said railway company, shall be deposited in escrow with the secretary of state of the state of Wisconsin; and that if said railroad from Monroe to the Mineral Point Railroad at or near the village of Gratiot, and thence to the village of Shullsburg, shall have been constructed by said party of the second part

so that trains of cars shall be actually running over it the whole distance, by or before the 1st day of October, 1881, thereupon, proper evidence thereof being to him produced, the said secretary of state shall deliver said bonds to said railroad company, and said certificate of stock to the authorities of said town of Gratiot; but he shall first detach from said bonds all interest coupons which may have become due before such completion, or which may become due within six months after such completion, and surrender and deliver them to the proper authorities of the town of Gratiot, to be by them canceled and destroyed. But if such railroad shall not have been constructed and completed by said second party between said *termini* — that is, from the village of Monroe to the village of Shullsburg — by or before the 1st day of October, 1881, so that trains of cars are actually running over it, then said secretary of state, upon proper evidence thereof being to him produced, shall return all of said bonds to the authorities of said town of Gratiot, to be by them canceled and destroyed, and he shall return said certificate of stock to the *Eastern, La Fayette & Mississippi Railway Company;* and thereafter all obligations on the part of said town of Gratiot to aid said *Eastern, La Fayette & Mississippi Railway Company* shall be at an end: provided, that if the said Dubuque, Platteville & Milwaukee Railroad should construct and equip a railroad from Monroe aforesaid to the Mineral Point Railroad, before such railroad shall be constructed as aforesaid between said *termini* by the said party of the second part, then this contract shall be null and void and of no effect, and said bonds shall be surrendered to said town. And it is provided and agreed, and is made a condition of this contract, that a depot shall be established and permanently maintained on said railroad at a point not further distant from the limits of said village of Gratiot than is the present depot on the Mineral Point Railroad from the limits of said village; and provided, that a copy of this con-

tract shall be deposited with said secretary of state for his guidance in regard to said matters.

"Witness the hands of the supervisors of the town of Gratiot, attested by the town clerk of said town, and the hands of the president and of the secretary of the *Eastern, La Fayette & Mississippi Railway Company*, and the corporate seal of said company, the day and year first written."

Immediately after the execution of this contract, the chairman of the town board of supervisors of the town of Gratiot and the town clerk of said town, in the name of said town, executed to said *Eastern, La Fayette & Mississippi Railway Company* thirty bonds, each for the payment by said town to said company, or bearer, of the sum of $500, numbered from 1 to 30 inclusive, to each of which bonds is attached fifteen interest coupons, each for the sum of $30, bearing date April 1, 1880, and said coupons maturing, one on the 1st day of each April succeeding the date of said bonds, the last coupon due maturing with the principal of said bonds on the 1st day of April, 1895. The form of these bonds is given in the complaint. At the same time, the said defendant railway company, by Edward Meloy, its president, and J. M. Brewster, acting as the secretary thereof, executed a certificate of stock for 150 shares of the capital stock of said railway company, the form of which certificate is also given in said complaint. The contract last above quoted, the thirty bonds, and the certificate of stock, were deposited with and are now held by the defendant *Hans B. Warner*, secretary of state of Wisconsin, as provided in the contract, to be disposed of by him as provided therein.

It is admitted that the Chicago, Milwaukee & St. Paul Railway Company built the railroad from Monroe through the village of Gratiot westward to Shullsburg within the time mentioned in the agreement made between the defendant railroad company and the said Chicago, Milwaukee & St. Paul Railway Company, and within the time mentioned in

the contract made between the said town of Gratiot and the defendant railway company, bearing date July 20, 1880; and it is further admitted that the authorities of the said town of Gratiot are ready and willing to direct the delivery of said bonds to the said defendant railway company, and to receive in exchange therefor the certificate of stock of said company for $15,000, at its par value.

It is urged by the learned counsel for the appellant that the town authorities have no lawful authority to deliver said bonds to the defendant company for several reasons, which we will now consider. The first objection in order, although made the third point in appellant's brief, is that there never has been a lawful submission of the question of granting aid to said company to the electors of said town; that the joint submission of the two companies to the town, and the vote of the electors upon such joint submission, is wholly unauthorized by law. The only objection to the form of the submission is that it was a joint one, and was voted upon as such. It is clear that if the submissions had been made separately, and an election had been held on the same day in said town, and separate votes had been taken upon each submission, it would have been regular.

The submission of the question of granting aid in this case, although contained in one written paper, is a separate submission on the part of each of the companies soliciting aid, and if separate votes had been taken on the question of aiding each of the companies on the conditions mentioned in the submission, there could have been no objection to the vote. We see no reason for holding the vote void because it was taken as a single vote upon the two separate propositions. The town was clearly authorized to aid either of the companies in the construction of its road from Monroe to Gratiot, and it was undoubtedly competent for the electors of the town to make it, conditioned upon the event that the company receiving its aid should build its road from Monroe

to Gratiot before a road should be built over the same line, by the other company. As said by the learned counsel for the appellant, the only object of the electors of the town of Gratiot was to procure the construction of a line of railway from Monroe to Gratiot; they had no peculiar interest in the construction of the line west of the village of Gratiot, and consequently it was a matter of indifference to them which of the two railway companies constructed such line. The object of the tax-payers of Gratiot would be as well accomplished by its construction by one as by the other of said companies.

The objection to a joint submission by the two companies and a vote upon such joint submission, which might be made with great force when the two propositions contemplated the construction of different lines of railway, has no force in this case. It might well be said if two propositions to construct two different lines of road were voted upon as one proposition, such vote would afford no evidence that a majority of the votes cast would have been cast for either proposition had it been voted upon separately, and so such vote should not be received as a vote to aid either of the contemplated roads. This case has no such difficulty in it. The vote of aid is for the same line of road, and is voted to that one of the two companies that shall first construct it, and the majority having voted in favor of the propositions submitted, it is clear that such majority have voted to aid the construction of the line of road from Monroe to the village of Gratiot. If it had been alleged or clearly shown that the electors of Gratiot had different interests in the construction of the road west of Gratiot, and that consequently some were induced to vote for the joint proposition who would not have voted for both propositions had they been submitted separately, there would be some reason for saying that the vote was not lawfully taken; but as no such matter is alleged to exist, and as it is more than probable none such did in fact exist, we

are inclined to hold that the proposition of the two companies, in the form it was made, may be treated as a several proposition by each company, and the vote as a separate vote upon each of said propositions, and that consequently the town lawfully voted aid to the extent of $15,000 to the company which first constructed a line of railroad from Monroe to the village of Gratiot; and, so holding, it follows that the tripartite contract made by the proper authorities of said town and the two railway companies, bearing date on the 19th day of August, 1871, was a valid contract binding upon the town.

It is further urged by the learned counsel for the appellant that the railway company has lost all rights under the contract of 1871 by lapse of time, or by the statute of limitations. It seems to us this objection cannot prevail. There was no limit fixed in the contract within which the railway company should construct the line of railroad in order to entitle itself to the aid voted; and in order to withdraw its proffered aid, if the town had the power to withdraw the same, it would certainly be necessary for the town to give the company notice that such aid would be withdrawn unless the railway company proceeded to the construction of the line of road and completed the same within a reasonable time. But it is unnecessary to determine whether the town might have withdrawn its aid upon reasonable notice to the company. It is not pretended that any such notice was in fact given. In 1872, and before it is claimed there had been any unreasonable delay on the part of the company in performing its part of the contract, the legislature passed an act for the very purpose of giving towns voting aid to railroad companies the power to put an end to their liability to furnish such aid at some definite period in the future, when no time for furnishing such aid was fixed by the contract. Sec. 12, ch. 182, Laws of 1872; sec. 955, R. S. 1878. This section provides that "it shall be lawful for

any town, county, city, or village, which shall have voted aid to any railroad company, . . . without limiting the time when such aid shall be earned by the company, by the authorities thereof, to fix and limit the time when such aid shall be earned: *provided*, that the time so fixed shall not be less than one year from the date of giving notice to such railroad company of the fixing of such limit; and if the aid shall not be earned in accordance with the conditions upon which it was voted within the time so fixed by such authorities, then such aid shall be forfeited."

There is no pretense that the authorities of the town of Gratiot ever limited the time within which the defendant company should earn the aid voted in 1871, until the making of the contract of July 20, 1880. All the proceedings on the part of the town and its authorities, including the making of the contract of 1871, above referred to, having been regularly taken and made, it remains to be considered whether the authorities of the town had the power to make the contract of July 20, 1880, and whether, under such contract, upon the facts proven, the defendant company is entitled to a delivery of the bonds. The learned counsel for the appellant insists that there can be no doubt of the power of the town board to make the contract of July, 1880, unless the objections taken to the proceedings, which we have considered, are fatal to the right of the company to demand the aid, under any circumstances, on the construction of the road from Monroe to Gratiot, and if such proceedings are held to be valid, then the contract of July 20, 1880, must determine the right of the company to the aid voted. His construction of secs. 16, 17, and 18 of defendant's charter, above cited, is that the electors of the town only vote upon the question of granting aid or not, and not upon the terms or conditions upon which the aid is granted. The learned counsel says: "If that question is decided in the affirmative, then the supervisors may or may not, *in their discretion*,

make a contract upon such terms and conditions as they think best. The law does not impose any liability in any way upon the town to aid by subscription to the capital stock of the road, by virtue alone of the vote of the electors in favor of such aid. The vote simply empowers the supervisors to contract; and, if they make a contract, that contract and nothing anterior to it binds the town. . . . If the supervisors had the power to make that contract (referring to the contract of 1871), they certainly had the power to agree with the other contracting party for a modification of it." He then claims that it was modified by the contract of July 20, 1880, and argues that, under that contract, the defendant company has not entitled itself to demand the aid voted.

Whether the learned counsel for the appellant be entirely correct in his construction of said secs. 16, 17, and 18 of defendant's charter, need not be determined. It is certain that the language of said sections will, perhaps, justify the construction given to them by him. But whether, when a definite proposition for aid is made by the railroad company under said sections, fixing the amount of aid asked for and the terms upon which it shall be earned, and such proposition is submitted to the electors of the town and voted upon by them and adopted, it would be competent for the authorities of the town to bind it for a much larger sum and upon terms radically different from those submitted by the railroad company, need not be determined in this case, as we are satisfied that there is nothing in the contract of July 20, 1880, which in any way impairs the rights of the town as secured by the contract of 1871. If there are any material changes of the contract of 1871 made by the contract of 1880, such changes are favorable to the town, and are such as the town ought not, in a court of equity, to be heard to complain of.

The learned counsel for the appellant insists that the defendant railway company is not entitled to the bonds in

question by the terms of the contract of July 20, 1880:
*First*, because it has not built the railroad from Monroe to
Gratiot, but that the railroad has been constructed by the
Chicago, Milwaukee & St. Paul Railway Company, and that
the construction of the road by that company does not en-
title the defendant company to the bonds; and, *second*, be-
cause the said defendant company has transferred its right·
of way and franchise to construct a railroad from Monroe
to Shullsburg to the Chicago, Milwaukee & St. Paul Com-
pany, the said town of Gratiot is released from its obligation
to pay for the 150 shares of stock subscribed for by it, and
agreed to be paid for by the delivery of its bonds for the
sum of $15,000; and, *third*, because the whole amount of
the $500,000 of stock authorized by its charter has never
been subscribed for by any one, and for that reason those
who have subscribed for the stock of said company cannot·
be compelled to pay for the amount subscribed for by them.

The first objection is based upon the terms of the contract
of July 20, 1880. That contract provides that said bonds
" shall be deposited in escrow with the secretary of state of
Wisconsin, and that if said railroad from Monroe to the
Mineral Point Railroad at or near the village of Gratiot,
and thence to the village of Shullsburg, shall have been
constructed by *the said party of the second part*, so that trains
of cars shall be actually running over it the whole distance
by or before the 1st day of October, 1881," then said bonds
shall be delivered to said railroad company, and the stock
certificate to the authorities of said town. It is strongly
urged that under this contract we are to presume that it was
the intention of the parties that the defendant company as
a corporation should build said railroad out of its own re-
sources, in order to entitle itself to the bonds in question,
and that it was not contemplated by the town that the com-
pany might procure it to be built by another corporation to
which it might transfer its franchise to build and operate·

the same. ' There would be great force in this objection were it not for the fact that all the evidence in the case shows that it was contemplated by the defendant company, by the electors of the town, and by the town authorities, that said defendant company might and probably would procure the building of said line of railroad by some other corporation to which their rights might be assigned. This appears from the original proposition made by the defendant company for aid, by the resolution of the town board of Gratiot, passed upon receiving such proposition and calling an election of the electors of the town to vote upon the question of such aid, and by the original contract made by the town with the two companies in 1871. The proposition for aid asks that the question may be submitted to the electors " whether the said town will aid in the construction of said railroad by subscribing and paying for 150 shares of the capital stock of that one of the said companies, by itself *or its assigns*, that shall first construct, build, and run its cars over said road from Monroe to said Mineral Point Railroad in said town of Gratiot."

The resolution passed by the town board before submitting the question to the electors has the following provision: " It is further ordered that the question to be submitted to the qualified electors of said town at the said election shall be: Will the town of Gratiot aid in the construction of the said railroad of that one of said companies that shall, *by itself or its assigns*, first build, construct, equip, and complete a railroad from said Monroe to said Mineral Point Railroad in said town of Gratiot, by subscribing for 150 shares of the capital stock of such company so first building said railroad, amounting at their par value to the sum of $15,000, and paying therefor the said sum of $15,000 in the manner and upon the terms and conditions following, that is to say: The amount of such aid that may be so voted by said town shall be taken and given by the said town, by its subscribing for said 150

shares of the capital stock of that one of the above companies that shall, *by itself or its assigns,* first build, equip, construct, and complete a railroad from said village of Monroe, thence westwardly to such point in the said town on said Mineral Point Railroad at or near the village of Gratiot or Riverside as the engineers of such company so building the said road shall determine as the most feasible?" The tripartite contract made by the town authorities with said railroad companies immediately after the electors of the town had voted to aid in building said road, in the manner set forth in said resolution of the town board of supervisors, contains the following provision: "It is hereby agreed and contracted that in view of the benefits and advantages which will inure to the town of Gratiot from the construction of a railroad from Monroe, in the county of Green, westwardly through the town of Gratiot to the Mineral Point Railroad, that the said town of Gratiot shall aid that one of the before-named railroad companies which shall, *by itself or its assignee,* first build, construct," etc., reciting the line of road to be built.

These several proceedings on the part of the electors of the town, and of the town authorities, clearly demonstrate that the electors and town authorities were willing to grant the aid in order to obtain the construction of a line of railroad from Monroe to the village of Gratiot, and that it was in fact a matter of slight importance to them what railroad company constructed the same, and that they were willing to issue their bonds for $15,000 in exchange for the like amount of the capital stock of that one of the two companies named which should build the road or cause it to be built by its assignee. The testimony of Edward Meloy and James H. Ernest shows that during all these negotiations and proceedings it was understood by the people of the towns which voted aid to the *Eastern, La Fayette & Mississippi Railway Company* to construct a railroad from Monroe to Gratiot, that said company would, if possible, induce the Chicago,

Milwaukee & St. Paul Railway Company to extend its line from Monroe west to Gratiot and Shullsburg, and that it was the intention of said *Eastern, La Fayette & Mississippi Railway Company* to assign said aid and its proper line of railway to said Chicago, Milwaukee & St. Paul Railway Company if a contract could be secured with said company to construct said railway, and with that in view the contracts with the towns voting aid provided that the aid should be payable to said *Eastern, La Fayette & Mississippi Railway Company or its assigns.* The testimony of these witnesses is in perfect harmony with all the other proceedings in the case, except it may be said that the contract of July 20, 1880, intentionally changed the relations of the parties, and by the terms of that agreement the right which had been theretofore given to the railroad company to procure the construction of the railroad by its *assignee* was intentionally taken away.

The learned counsel for the appellant argues that this contract could only be performed by the railroad company by building the railroad itself as a corporation, and under the provisions of its charter, and that if it caused its construction by the Chicago, Milwaukee & St. Paul Railway Company it would not be entitled to receive the aid voted. We think the construction given to the contract of 1880 by the learned counsel is not the true construction, and ought not to be adopted. The recitals in the contract show that the purpose was to revive the old contract of 1871, and limit it to the defendant company as the only one to perform it, limit the time of performance, the rate of interest on the bonds to be issued, add a further condition that the bonds should not be earned until the road was completed to Shullsburg, and other minor matters in relation to the form of the bonds and place of payment. The mere omission of the words " *or assigns,*" in the contract, we think, should not be held to have taken away the company's

right to do the work by its assignee. The attending circumstances clearly show that such was not the intent of the defendant company. The evidence shows that at the time this contract was made the company was negotiating for, if it had not already negotiated, a contract with the Chicago, Milwaukee & St. Paul Railway Company to build the road upon their right of way, on the line located by it, upon a surrender of its franchise to said company, and an assignment of the aid voted to the defendant company, including the aid from the town of Gratiot, on its building the road from Monroe to Shullsburg. It is clear that the defendant supposed it would be entitled to the aid voted, though it did not build or cause the road to be built as a corporation and under its franchises, but that the aid would be earned if the road were built by its assignee. And, so far as the constituted authorities of the town of Gratiot are concerned, that is the view taken of the contract by them. The evidence shows they stand ready to give the aid voted upon that construction of the contract. The aid having been voted by the electors of the town upon the theory that it might be earned by the company if it procured the road to be constructed by its assignee, it would seem to accord with the principles of equity to give the contract the construction put upon it by the parties making it. It is argued that at the time the aid was voted and the original contract was made the defendant company had no authority to transfer its franchises to another company, and so it could have no assignee that could build the road in its place. Without stopping to consider whether this point is well taken, it is evident that the company could have procured by legislation the right to so transfer its franchises, and the contract might, therefore, be fairly construed as contemplating such legislation in order to carry out the intention of the parties thereto. Ch. 292, Laws of 1874, now a part of sec. 1833, R. S. 1878, gave the defendant company full authority to

make the transfer which it did to the Chicago, Milwaukee &
St. Paul Railway Company.

It is also urged that the road was not built by the Chicago,
Milwaukee & St. Paul Railway Company as the assignee of
the defendant company, but as an extension of the St. Paul
road, having in fact no connection with the defendant com-
pany, and that the building by the St. Paul company was in
no sense a building of the road by the defendant company
either directly or indirectly, and so the defendant company
has wholly failed to perform its part of the contract with the
town and has no claim to the aid voted. If it were a fact
that the Chicago, Milwaukee & St. Paul Railway Company
built the line of road from Monroe west to Gratiot and
Shullsburg, without in any way being induced to build the
same by the defendant company, we think the learned coun-
sel for the appellant would be correct in his conclusion that
the defendant company had not performed its contract and
was not, therefore, entitled to the aid voted; but if, on the
other hand, the aid voted to the defendant company, and the
assignment of such aid to the Chicago, Milwaukee & St.
Paul Railway Company, together with the assignment of the
other property of said defendant company, including its
right of way and franchises, induced the St. Paul company
to build the line of road on the route and within the time
agreed upon in the contract between the town and the de-
fendant company, then we think it must be held that the
defendant company caused the said road to be built by its
assignee within the meaning of the contract with the town.
There is nothing in the record in this case which shows that
the St. Paul company would have built the road from Monroe
to Gratiot and Shullsburg within the time fixed, and upon
the line upon which it was agreed it should be built by the
defendant company, without the inducements held out to it
by the defendant company. On the other hand, the answer
of the respondents alleges that the principal inducement for

building the road by the St. Paul company within the time and upon the line laid out and adopted by the defendant company, was the transfer of the aid, right of way, and franchises of the defendant company to the St. Paul company, and the evidence produced upon the motion to dissolve the injunction tends to prove such allegation in the answer. We must hold, therefore, that the defendant company was the cause of the construction of the road, and that it was built by the St. Paul company as the assignee of the defendant company within the meaning of the contract.

It is further urged by the counsel for the appellant that because the defendant has transferred its right to build a railroad from Monroe west to Shullsburg, it is no longer the company for whose stock the town subscribed, and consequently the town cannot be compelled to take the stock and pay for it as agreed.

It is not denied that the corporation still exists, and that it still retains all its corporate powers for the purpose of building a railroad from Shullsburg to the Mississippi river; but it is claimed that it is no longer the corporation for whose stock the town subscribed, and it is not, therefore, required to pay for the same.

This court held in the case of *Nœsen v. Town of Port Washington*, 37 Wis., 169, that a fundamental and radical change in the character of the original purpose and object of the corporation released those subscribers to the stock of the corporation who did not assent to such change. In the case at bar there has been no change in the purposes or objects of the corporation. The object and purpose of the corporation was, when the town made its subscription for its stock, to build a railroad from Monroe by the way of Gratiot and Shullsburg to the Mississippi river. A part of that purpose it has accomplished by causing such road to be built from Monroe to Shullsburg, and it retains all its rights and franchises to build from there to the Mississippi river. Hav-

ing accomplished one part of its purpose, it has transferred the right to operate the part of its road completed to another company having the right to purchase the same. This it had the right to do under the laws of this state, and it does not appear to us to be an abandonment of its original purpose to build a road to the Mississippi river. As was said in *Nugent v. Supervisors*, 19 Wall., 241: "The law of the state having authorized the sale of the railroad of the defendant company, or any part of it, to another company, the subscribers for its stock must have contemplated that such a sale might be made, and they cannot avoid their subscription because it was thereafter made." But upon the facts in this case we think it clear that the town of Gratiot contemplated when it voted the aid, and when it subscribed for its stock, that what has happened was in contemplation by the company, and the subscription was made with an implied understanding, at least, that the company might transfer to another company a part of its line of road if necessary for the purpose of accomplishing its construction, and it cannot, therefore, avoid its subscription on that account. It must be held as assenting to the transfer made. The case in 37 Wis., *supra*, plainly intimates that if the subscriber for stock contemplated that a change would be made in the objects and purpose of the corporation, or assented either before or after the change to its being made, he would be held to his subscription, notwithstanding such change. Redfield, in his work on the Law of Railways, after an examination of numerous authorities, arrives at the following result: "But it is no defense to an action for calls, that the directors have altered the location of the road, if by the charter they had the discretion to do so. And if the charter contains a provision that the legislature may alter or amend the same, the exercise of this power will not absolve the shareholders from their liability to pay calls. And all subscriptions to stocks, and all contracts for the purchase of stock to be delivered at

a future day, must be understood to be made subject to the exercise of all legal powers of the directors and of the legislature; and an illegal exercise of power by either will, it has sometimes been said, bind no one, and should exonerate no one from his just obligations." 2 Redf. on Railways (5th ed.), 209, 210. It is unnecessary to determine whether the decisions of this court in the cases of *Kenosha, R. & R. I. R. R. Co. v. Marsh*, 17 Wis., 13, and *Nœsen v. Town of Port Washington*, 37 Wis., 169, are in entire accord with the doctrine laid down by Redfield, as we think it very clear that the subscription in this case was made with the understanding that what has been done by the defendant company might be done, and in such case all the decisions agree that the subscriber is not relieved from his subscription.

It is further urged by counsel for the appellant that because the whole of the stock authorized to be issued by the act incorporating the defendant company had not been subscribed for, the town could not be compelled to pay for its subscription. In this, we think, they are mistaken. The act incorporating the company incorporates certain persons named in the act and their associates. The act makes the men named therein a corporation for the purpose of building a certain railroad, and authorizes such company to issue a stated amount of capital stock. The act, in no part of it, declares that it shall have no power to act as a corporation until a certain amount of stock is subscribed for and a certain amount of capital is paid in. The whole matter is left to the discretion of the incorporators and such contracts as they may lawfully make with their subscribers. It may be that a stock subscriber could make his subscription conditional, and not to be effective until a certain amount of stock was subscribed and a certain percentage thereof paid in, but in this case the subscription was not made dependent upon any such condition, but upon the sole condition that the defendant company should build a certain part of its

road either by itself or its assignee. We do not find that any of the cases referred to by the learned counsel for the appellant upon this point are at all applicable to the facts of this case.

It is also urged that the capital stock tendered by the defendant company in exchange for the bonds of the town are utterly valueless. The value of the stock subscribed for is immaterial in an action to recover on a subscription therefor. An individual or corporation who makes a valid subscription for the capital stock of a corporation, when not induced to make the same by fraud on the part of the corporation or its officers, assumes the risk of the value, and he cannot defend an action to recover the amount of the subscription by showing that the stock has no real or marketable value. This court has not, in any of the large number of cases in which the question of the liability of municipal corporations upon subscriptions for the capital stock of a railroad company has been considered, intimated that a municipality subscribing could defend an action to recover upon the subscription by showing that the stock subscribed for was valueless. It seems to us very clear that, in the absence of fraud, it is no defense to an action to recover upon a valid subscription that the stock subscribed for is of no value in fact. 1 Redf. on Railways, 153, 154.

We think the record shows no equity in favor of the appellant, and that the temporary injunction was rightly dissolved.

LYON, J., dissents.

ORTON, J. I most respectfully dissent from the majority opinion of the court in this case.

The company (and only one company need be mentioned) for whose benefit these bonds of the town of Gratiot were voted to aid in the construction of its railway, in exchange

for its stock, in 1871, had located the only line deemed feasible, and procured some right of way, and nothing further was done, and the scheme for the time was abandoned. In 1880, by certain contracts sanctioned by the supervisors of said town, the bonds voted, together with the stock of that old company, were placed in the hands of the secretary of state, and the bonds were to be delivered to the Chicago, Milwaukee & St. Paul Railway Company upon the completion of said road, and the old company sold for a mere nominal consideration to said company all the property and franchises it had, which consisted of this small portion of the right of way, and the inchoate right to these and the bonds of other towns on the line of the road, and thereafter said company completed the road, and now owns and operates it in connection with, or as an extension of, its main lines of road, and demands in this proceeding the delivery of these bonds, and offers in exchange for them the stock of that old company. That old company was virtually dissolved by the sale of all its property and franchises, and long since became *functus officio*. It never really issued any stock, because none has ever been delivered, and the right to issue any ceased with its dissolution. It never constructed a foot of road and owns none, and the only road contemplated by the original proposition and the subscription was built and is owned by another company.

This is substantially the case. It is not claimed that these contracts in relation to the bonds have any binding force upon the town, and that there was any authority in the supervisors to make such contracts cannot be lawfully asserted. That the stock of the old company (if it ever issued any) is perfectly worthless, and does not represent anything of value whatever in the road or franchises, is not disputed. It has long since been the settled law by the decisions of this court that towns cannot *donate* their bonds for such a private purpose. The only ground upon which

town aid to a railway can be sustained, is that the town receives an adequate pecuniary consideration for it beyond the general benefits of the road to the people of the town. The stock of the corporation may be such a consideration, but it is only such when it is based upon and represents the *railway* itself passing through such town, and to build which the aid has been voted by the taxable inhabitants. The only principle upon which a town can thus aid in the construction of the road in consideration of stock representing so much interest in the road itself, is that a town might itself build such a railroad and own the same, and tax the inhabitants therefor. It is idle and childish to claim that this stock is of any value whatever, or represents anything of value. Courts deal with substance and not with shadows. But it is sufficient that it does not represent any part of this railway to aid in the building of which the bonds were voted. If this town is compelled in this case to deliver its bonds as claimed, and to receive in exchange for them this stock of the old defunct corporation, which has no interest at all in the road and never had, the case of *Whiting v. S. & F. du L. R. R. Co.*, 25 Wis., 167, and the numerous cases following it in this court, will be substantially overruled, and the many cases to the same effect in other courts disapproved. The following sentence from the able opinion of Chief Justice Dixon expresses in few words the only principle upon which such town aid can be sustained and justified: "*The city, town, or county becomes a part owner of the road to the extent of the stock taken.*" At the time when the bonds are exchanged for the stock of the company, such stock must represent an equal interest in the road, and the town become a part owner of the road to that extent, the same as if it had directly constructed it or had been a party in doing so. After that, if by the fortunes of its management such stock becomes worthless, the town cannot complain, for it has had a voice in that management. It is a very poor argument

that because such may be and often is the result of such an enterprise, the stock need not represent anything when received. The company may afterwards lose the road; it must, however, own the road when the stock is to be delivered. If this town can now be forced to part with its bonds to a company which built and owns the road, in exchange for the stock of a company which not only has no interest in the road, but owns no property or even franchises, and, in connection with the road contemplated, cannot be said to exist as a corporation, then the language of the opinion in. *Sweet v. Hulbert,* 51 Barb., 316, adopted by the chief justice in the above case as applicable to a town *donation* to a private corporation of its bonds, has even more force than when there used: "If this can be done, it is legal robbery; less respectable than highway robbery." It is said that the old company had a right to sell or assign the enterprise or construct the road by itself or by its assigns, but it does not follow that the bonds can be claimed without the consideration of stock which represents and is based upon the road. If the work can be assigned, together with these bonds, as the property of the old company, the assignee must succeed to the *liabilities* as well as to the rights of that company.

The unworthy suggestion to justify such an outrageous departure from the principle established in the above case, that the town has got the road and its benefits, is answered in the above opinion. "The two things must unquestionably concur, in order to sustain the tax, [an interest in the road itself represented by the stock, and the general benefits to the town from the road within it], but the last alone, which may be termed the benefit incidentally arising to the public, is *clearly insufficient* for that purpose." If the Chicago, Milwaukee & St. Paul Railway Company is entitled to these bonds under any circumstances, which is doubted, it must give the town in some way, as a consideration, an

equal interest in this road either by its stock or otherwise. It makes no difference in principle that the bonds and stock were prepared in this form before the road was constructed. They have never been delivered, and the case is as if this company having now, either by a nominal purchase from the old company or without it, constructed this road, should demand that the town issue bonds to the amount named, and tender in exchange for them the newly issued stock of this old defunct company. I will not say that this would be "robbery," but it most certainly appears like the worst kind of a fraud, and a cheat unworthy of this great company.

The word "equity," at least, ought not to be used in connection with such a consummation.

*By the Court.*— The order of the circuit court is affirmed, with costs, and the cause remanded for further proceedings.