## NUGENT v. THE SUPERVISORS.

1. To constitute a "subscription" by a county to stock in a railroad company, it is not necessary that there be an act of chirographical subscribing.   A resolution of the county declaring a subscription made, an acceptance of such subscription by the railroad company, and notice to the county of such acceptance; the delivery to the railroad company by the proper county officers of the county bonds, and acceptance by the county of the corresponding stock, voting as a stockholder and levying a tax to pay the interest on the bonds, estop the county (assuming that it had a legal right to subscribe) from denying its subscription.

---

* Attorney-General v. ——, 2 Anstruther, 558.

2. Although a subscriber for stock in a company is released from his sub-
scription by a subsequent alteration of the organization or purposes of
the company, this is only when such alteration is a fundamental one,
and when, in addition, it is not provided for or contemplated by either
the charter itself or the general laws of the State.

ERROR to the Circuit Court for the Northern District of
Illinois; in which court, in December, 1872, Nugent sued
the supervisors of Putnam County, Illinois, on coupons for
the interest of certain bonds issued by the said county.

The case, as appearing on demurrer to a replication by
the plaintiff to several pleas of the defendant, and by ad-
mitted statutes, was thus:

A general statute of the State of Illinois, entitled "An
act to enable railroad companies . . . to consolidate their
stock," passed February 28th, 1854, thus enacts:

"SECTION 1. All railroad companies now organized, or here-
after to be organized, which now have, or hereafter may have
their termini fixed by law, whenever their said road or roads
intersect by continuous lines, may, and the same are hereby au-
thorized and empowered to consolidate their property and stock
with each other, and *to consolidate with companies out of this State,
whenever their lines connect with the lines of such companies out of
this State.*

"SECTION 2. The said companies, when so consolidated, shall
be authorized to agree upon the name or names of such consoli-
dated company; and by such name or names the said consoli-
dated company shall be a body corporate and politic, . . . and
shall have all the powers, franchises, and immunities which the
said respective companies shall have by virtue of their respec-
tive charters, before such consolidation passed, within the State
of Illinois."

A similar general statute exists in Indiana.*

This public statute being in force, the State of Illinois, on
the 15th of April, 1869, by special act, incorporated the Kan-
kakee and Illinois River Railroad Company. The company
was authorized to make and maintain a railroad from the

---

* Act of February 23d, 1853; see Clearwater *v.* Meredith, 1 Wallace, 26.

eastern line of the State to a place called Bureau Junction; and had liberty to increase its stock to such an amount as might be necessary to complete its road.   The eleventh section of its charter ran thus:

"SECTION 11. It shall be lawful for said company, and they shall have power to unite or consolidate its railroad with any other railroad or railroads now constructed, or being constructed, or which may hereafter be constructed within this State, *or any other State*, which may cross or intersect the same, *or be built along the line thereof*, upon such terms as may be mutually agreed upon between said company, or any other company.   And for said purpose, full power is hereby given said company to make and execute such contracts with any other company or companies as will secure the object of such connections or consolidations."

At the same time the county of Putnam was empowered, by a general law of the State, to subscribe for the stock of the company, and to issue its bonds in payment of its subscription.   In attempted exercise of the power thus conferred, the board of supervisors of the county, on the 4th day of June, 1869, ordered an election to be held, to determine whether the county should subscribe for stock of the railroad company, to the amount of $75,000, to be paid for with the bonds of the county, provided the railroad should be so located and constructed through, or within one-half mile of, the town of Hennepin.   The election was held, and it resulted in favor of the subscription.   On the 4th day of January, 1870, another election was ordered, to determine whether the county would subscribe for $25,000 more of the stock, to be paid in the same manner, and with a similar provision respecting the location of the road.   This subscription was also sanctioned by the popular vote.   On the 24th day of September, 1869, the railroad company accepted the $75,000 subscription, and on the 27th of October next following, gave notice of the acceptance to the board of supervisors of the county.   This notice was put upon record, and on the same day the board of supervisors adopted a resolution that the subscription was thereby made for the

building of the railroad, and directed the clerk of the county court to execute and deliver the bonds on behalf of the county. The resolution also declared that the bonds should be issued on the written order of a committee appointed to protect the interests of the county; that they should not be issued until the railroad company should have made a *bonâ fide* contract with responsible parties for all necessary iron for their road, nor until the company should have made a *bonâ fide* contract with responsible parties for laying the iron and operating the road through the county, as specified in a previous order of the board. On the 15th day of March, 1870, the second subscription for $25,000 was made in a similar manner, and with like directions.

The bonds, with the proper number of coupons attached, were executed in proper form by the proper county officers. The bonds were made payable to the Kankakee and Illinois River Railroad Company "*or bearer;*" the coupons to the bearer simply.

On the 12th of January, 1870, and before the instruments were delivered to the said railroad company, a company had been organized under the laws of Indiana, for the purpose of building a railroad from Plymouth, Indiana, to the east line of the State of Illinois, at some point to be selected in the direction of Momence and Kankakee, with a view to connection with some railroad leading westward. Its corporate name was the Plymouth, Kankakee, and Pacific Railroad Company. With this corporation, on the 21st day of October, 1870, the Kankakee and Illinois River Railroad Company became consolidated, taking the name of the former. This consolidation was made at the instance of the board of supervisors of Putnam County. It was not asserted that it had not been legally effected. The consolidation being completed, and the conditions precedent to the delivery of the bonds having been complied with to the satisfaction of the officers of the county, the bonds and coupons were delivered to the railroad company, and certificates for a corresponding amount of stock in the consolidated company delivered to and received by the county. The county voted as a stock-

holder of the railroad company, and proceeded to levy a tax to pay the interest on the bonds.

Certain of the coupons passed into the hands of the plaintiff, Nugent, *bonâ fide;* he having paid value for them, in the market, without notice of any defence.

On these coupons it was that the present suit was brought.

The court below, disregarding an argument made in the case, that the county had made no actual *subscription*, and that what it had otherwise done wanted such completeness of action as would amount to a "subscription" in law to anything—sustained nevertheless the demurrer on other grounds.   It said:

"I feel compelled to say that I cannot find any line of distinction between this case and *Marsh* v. *Fulton County*,* but it seems to me that that case must control the decision of the court in this.

"The vote of the 10th of July, 1869, and the 8th of February, 1870, were both upon the proposition to subscribe to the capital stock of the Kankakee and Illinois River Railroad Company, a corporation possessing the power to construct and maintain a line of road between certain termini in this State, with a capital stock limited, in any event, to the cost of constructing of this road.   The bonds in question were issued after this Kankakee and Illinois River Railroad Company had merged itself, by articles of consolidation, into another corporation, now known as the Plymouth, Kankakee and Pacific Railroad Company, a road having control of a different enterprise from that of the original corporation, possessing a different capital stock, and governed by a different board of directors, elected upon a different basis, with different termini to the road.

"In the case of *Clearwater* v. *Meredith*, in the 1st of Wallace,† the Supreme Court of the United States has passed upon the effect of consolidating railroad corporations.   The principle which I have alluded to is there clearly announced, namely, that a different corporation results from the consolidation.   The consolidated company is not either of the original corporations, although it may take the name of one of them.   Here the original corporation for the stock of which the county of Putnam

---

* 10 Wallace, 676.                  † Page 25.

subscribed, was solely under control of the State of Illinois; its franchises had been created by that State, and were under its control. The consolidated company is in two States; its affairs are subject to the control of the legislatures of two States.

"Now, the principle of these authorities, it seems to me, is that the corporate existence of the Kankakee and Illinois River Railroad Company ceased on the 21st of October, 1871, and from that time forward whatever franchises it had were merged in the Plymouth, Kankakee and Pacific Railroad Company, the consolidated corporation, and after this event had taken place, after what we may call the legal demise of the Kankakee and Illinois River Railroad Company, the board of supervisors of Putnam County authorized the issue to the consolidated corporation of the bonds in question.

"I cannot see any feature in this case which differs from *Marsh* v. *Fulton County*, unless that this is a stronger case than that. There the corporation existed in and was controlled by this State alone, and its termini remained the same, while this consolidated corporation is a very different enterprise from the original to which the subscription was authorized.

"It was insisted in the argument, and also in the pleadings, that these bonds being made payable in terms to the Kankakee and Illinois River Railroad Company, is a fact which the court should notice, and which should control the decision of the court. It certainly is an important fact, and has received consideration, but I cannot see that it changes the legal bearings of the question. This was a defunct corporation, and the bonds might just as well have been made payable to bearer, and the person to whom they are made payable cuts no figure in the case.

"In the case of *Clearwater* v. *Meredith*, the general law of the State of Indiana existed at the time the stock in question was issued. The law of that State and of Illinois are substantially the same, the two States keeping pace with each other in their legislation on this question; but the Supreme Court did not hold that the organic right of either or both corporations to consolidate changed the rights of the stockholders."

To a judgment against him the plaintiff took this writ of error.

*Mr. T. M. Shaw, for the plaintiff in error; Mr. T. L. Dickey, contra.*

Mr. Justice STRONG delivered the opinion of the court.

We think the Circuit Court erred in sustaining the demurrer to the plaintiff's replication. The bonds to which the coupons in suit were attached, purport to have been made and issued by the order of the board of supervisors of Putnam County, in payment of the county's subscription to the capital stock of the Kankakee and Illinois River Railroad Company. They are made payable to that company or bearer, and the plaintiff is a *bonâ fide* holder of the coupons, having paid value for them without notice of any defence. If, then, the bonds are valid obligations, if they were rightfully issued, the right of the plaintiff to a judgment against the county is plain.

That by what it did in the matter the county became in effect a subscriber to the capital stock of the railroad company, and liable for the sums designated, admits of no serious question. The fact that no subscription was formally made upon the books of the company is quite immaterial. In *The Justices of Clarke County* v. *The Paris, Winchester, and Kentucky River Turnpike Company,* * it was ruled that an order of the County Court, by which it was said that it subscribed for a specified number of shares of road stock, was binding, the court having authority to make a subscription. In this case there was more. There was not only the resolution, declaring the subscription made, but there was an acceptance by the railroad company, and notice of the acceptance. The minds of the parties came together. Both understood that a contract was made, and had nothing subsequently occurred to change their relations the county could have enforced the delivery of the stock, and the company could have compelled the delivery to itself of the bonds, on performance of the conditions stipulated. So the parties regarded their relations to each other. The bonds were delivered. The committee appointed by the board of supervisors to protect the interests of the county, under whose direction the bonds were ordered to be issued, were satisfied

---

* 11 B. Monroe, 143.

that all the prescribed conditions precedent to their delivery had been complied with, and they so decided. The county accepted the position of a stockholder, received certificates for the stock subscribed, voted as a stockholder, and proceeded to levy a tax to pay the interest falling due on the bonds. Were this all of the case, the validity of the bonds, and of their accompanying coupons in the hands of a *bonâ fide* holder for value, would be beyond doubt.

The Circuit Court, however, was of opinion, and so decided, that the bonds are invalid, because before their delivery the Kankakee and Illinois River Railroad Company had become consolidated with the Plymouth, Kankakee, and Pacific Railroad Company, another corporation. This consolidation was authorized by the general laws of the two States, and by a section in the special charter of the latter company. No claim is made that it was not legally effected. The result necessarily was, that the consolidated company succeeded to all the rights, property, and privileges which belonged to each of the two companies out of which it was formed, before their consolidation. It was not until after this had taken place that the county bonds were handed over and sold, and it was certificates of the stock of the consolidated company which the county received.

What, then, was the legal effect of the consolidation? Did it release the county from its prior assumption to take stock in the Kankakee and Illinois River Railroad Company and give its bonds in payment? Or, did it render unauthorized the subsequent delivery of the bonds, and make them invalid even in the hands of a *bonâ fide* purchaser? These are the only questions presented by the record that need discussion.

It must be conceded, as a general rule, that a subscriber to the stock of a railroad company is released from obligation to pay his subscription by a fundamental alteration of the charter. The reason of the rule is evident. A subscription is always presumed to have been made in view of the main design of the corporation, and of the arrangements made for its accomplishment. A radical change in the organization or purposes of the company may, therefore, take

away the motive which induced the subscription, as well as affect injuriously the consideration of the contract. For this reason it is held that such a change exonerates a subscriber from liability for his subscription; or, if the contract has been executed, justifies a stockholder in resorting to a court of equity to restrain the company from applying the funds of the original organization to any project not contemplated by it. But while this is true as a general rule it has no applicability to a case like the present. The consolidation of the Kankakee and Illinois River Railroad Company with another company was no departure from its original design. The general statute of the State, approved February 28th, 1854, authorized all railroad companies then organized, or thereafter to be organized, to consolidate their property and stock with each other, and with companies out of the State, whenever their lines connect with the lines of such companies out of the State. The act further declared that the consolidated company should have all the powers, franchises, and immunities which the consolidating companies respectively had before their consolidation. Nor is this all. The special charter of the Kankakee and Illinois River Railroad Company contained, in its eleventh section, an express grant to the company of authority to unite or consolidate its railroad with any other railroad or railroads then constructed or that might thereafter be constructed within the State, or any other State, which might cross or intersect the same, or be built along the line thereof, upon such terms as might be mutually agreed upon between said company and any other company. It was therefore contemplated by the legislature, as it must have been by all the subscribers to the stock of the company, that precisely what has occurred might occur. Subscribers must be presumed to have known the law of the State and to have contracted in view of it. When the voters of the county of Putnam sanctioned a county subscription by their vote, and when the board of supervisors, in pursuance of that sanction, resolved to make the subscription, they were informed by the law of the State that a consolidation with another company might be made, that the stock

they proposed to subscribe might be converted into stock of the consolidated company, and that the liability they assumed might become owing to that company. With this knowledge and in view of such contingencies they made the contract. The consolidation, therefore, wrought no change in the organization or design of the company to which they subscribed other than they contemplated at the time as possible and legitimate. It cannot be said that any motive for their subscription has been taken away, or that the consideration for it has failed. Hence the reason of the general rule we have conceded does not exist in this case, and, consequently, the rule is inapplicable.

In a multitude of cases decided in England and in this country it has been determined that a subscriber for the stock of a company is not released from his engagement to take it and pay for it by any alteration of the organization or purposes of the company which, at the time the subscription was made, were authorized either by the general law or by the special charter, and a clear distinction is recognized between the effect of such alterations and the effect of those made under legislation subsequent to the contract of subscription. In *The Cork and Youghal Railway Company* v. *Paterson*,* which was an action to recover a call of one pound per share on one hundred shares subscribed, it appeared that the defendant was one of the subscribers to the agreement for the Cork, Middleton, and Youghal Railroad Company. That agreement authorized the provisional directors to extend the purposes of the organization, to change the termini of the road, and to amalgamate with other companies. The subscriber's agreement for the Cork and Waterford Railroad Company contained similar provisions. After the defendant's subscription was made the two companies executed a deed of amalgamation, without any other assent of the defendant than his signature to the subscriber's agreement for the first-named company. Upon this state of facts all the judges held that he remained liable on his sub-

---

* 37 English Law and Equity, 398.

scription. Its effect was said, by Chief Justice Jervis, to be an authority to the company to tack his subscription to anything else they might see fit, and thus make him a subscriber to that, and therefore, added the judge, by signing the Cork and Youghal he afforded an authority to the directors to apply his signature to the Cork and Waterford, and so make him a subscriber to that. To the same effect are the cases of *Nixon* v. *Brownlow* and *Nixon* v. *Green.** The American authorities are equally explicit. They uniformly assert that the subscriber for stock is released from his subscription by a subsequent alteration of the organization or purposes of the company, only when such alteration is both fundamental *and not provided for or contemplated by either the charter itself or the general laws of the State.* In *Sparrow* v. *The Evansville and Crawfordsville Railroad Company,*† where it appeared that after a public act had taken effect authorizing the consolidation of the charters of two railroad companies, the defendant had subscribed for shares in one of them, and a consolidation was afterwards made, he was held liable to the consolidated company for his subscription, and this, though the consolidation took place without his knowledge or consent. The same doctrine was asserted in *Bish* v. *Johnson.*‡ The Supreme Court of Connecticut recognized the rule in *Bishop* v. *Brainerd,*§ and a subscriber to one company was held to be a debtor to the consolidated company in a case where there was no general authority to consolidate, but the charter of the company was subject to amendment by the legislature, and where the legislature, after the subscription confirmed the consolidation.

Many other citations are at hand, but these are sufficient.

---

* 3 Hurlstone & Norman, 686.       † 7 Porter (Indiana), 369.

‡ 21 Indiana, 299; see also Hanna v. Cincinnati, 20 Id. 30.

§ 28 Connecticut, 289; see also Schenectady and Saratoga Plankroad Co. v. Thatcher, 1 Kernan, 102; Buffalo and New York City Railroad Co. v. Dudley, 4 Id. 336; Meadow Dam v. Gray, 30 Maine, 547; Agricultural Branch Railroad Co. v. Winchester, 13 Allen, 32; Noyes v. Spaulding, 27 Vermont, 420; Pacific Railroad Co. v. Renshaw, 18 Missouri, 210; Fry v. Lexington, 2 Metcalfe, 314; Illinois River Railroad Co. v. Beers, 27 Illincis. 189; Terre Haute and Alton Railroad Co. v. Earp, 21 Id. 292.

No well-considered cases are in conflict with them. *Marsh* v. *Fulton County* is altogether a different case. In that it appeared that the people of the county voted in November, 1853, in favor of a subscription for stock in the Mississippi and Wabash Railroad Company, and in April, 1854, the board of supervisors of the county ordered their clerk to make the subscription. It was not, however, then made. Subsequently, in 1857, the legislature made fundamental changes in the organization of the company, dividing it substantially into three companies, with a distinct governing body for each, and with three classes of stockholders. It was after this that the county subscription was made; and made not for the stock of the Mississippi and Wabash Railroad Company, but for the stock of one of the divisions. Necessarily, therefore, we held that there was no authority to make the subscription which was made, that it had not been approved by a popular vote, and hence that the bonds issued in payment for it were invalid. The county had entered into no contract until after the radical changes had been made in the organization of the company. It never assented to such a change, and when the proposed subscription was approved by the popular vote, there was no reason to expect the change afterwards made. There was at that time nothing in the general law of the State, and nothing in the charter, which authorized the company to change its organization, or which looked to its division into several distinct corporations. It needs nothing more to show how unlike that case was to the present.

In the case in hand the county had, under lawful authority, undertaken to subscribe for stock before the consolidation was made, and the undertaking had been accepted. A liability had been incurred, and the business agents of the county, to whom exclusively the law intrusted the management of its affairs, consented to and promoted the consolidation. And the subscription was made in full view of the law that allowed an amalgamation with another company. The contract was made with reference to that law. Nothing has taken place which the county was not bound to antici-

pate as likely to happen, and to which the people in voting for the subscription, and the board of supervisors in directing it, must not be considered as having consented. What was ruled in *Marsh* v. *Fulton County*, therefore, does not touch this case. Nor was there anything decided in *Clearwater* v. *Meredith* which sustains in any degree the defence set up on behalf of the defendants.

We have, then, in brief, this case: The people of Putnam County, in pursuance of law, voted a county subscription for stock in a railroad company, to be paid for with county bonds. The financial agents of the county agreed to make the subscription, and the company accepted it. The bonds were made payable to the company, or bearer, but before they were delivered, the company became consolidated with another, in pursuance of authority conferred by the law in force when the subscription was voted, and at the instance of the board of supervisors of the county. All the conditions precedent to the delivery of the bonds were complied with to the satisfaction of the county agents, certificates for the stock were received, and the bonds were delivered and sold. The plaintiff is a *bonâ fide* holder of some of the coupons for value paid. It would, we think, be a reproach to the administration of justice if he cannot enforce the payment of those coupons, and we see no principle of law or equity that stands in the way of his action. He found the bonds and the coupons upon the market, payable to the Kankakee and Illinois River Railroad Company, or bearer. Proposing to buy, he had only to inquire whether the county was, by law, authorized to issue them, and whether their issue had been approved by a popular vote. He was not bound to inquire farther, and had he inquired he would have found full authority for the issue, and if he had also known of the consolidation it would not have affected him.

JUDGMENT REVERSED, and the cause remitted with instructions to    OVERRULE THE DEFENDANT'S DEMURRER.

Dissenting, Mr. Justice DAVIS and Mr. Justice MILLER.