JAMES C. COLGATE et al.

*v.*

THE UNITED STATES LEATHER COMPANY et al.

ROBERT A. JOHNSTON et al.

*v.*

CENTRAL LEATHER COMPANY and THE UNITED STATES LEATHER COMPANY.

[Decided August 1st, 1907.]

1. One purchasing stock in a corporation, organized for a specified period, cannot object to its subsequent exercise, in a legal manner, of the power to consolidate with another corporation, where the power existed at the time of the purchase, but was conferred subsequent to its organization, but the right to object to the consolidation belongs only to the persons who were shareholders before the power to consolidate was given.

2. A corporation, organized while Corporation act of 1875, section 13 (*Rev. Stat. 1877 p. 180*), was in force, and before the passage of act of March 21st, 1893, authorizing amendments of certificates of incorporation, and providing that the amended certificate shall take the place of the original certificate and shall be deemed to have been recorded and filed on the date of recording and filing the original certificate, issued and sold stock under an amended certificate made subsequent to the act of 1893.—*Held,* that the retroactive effect of the filing of the amended certificate cured defects in the original certificate, but the corporation was not deprived of the power which it had at the time of the passage of the act of 1893 to act under the consolidation law passed prior to the act of 1893 and subsequent to the organization of the corporation.

3. The provision of act March 21st, 1893, authorizing the filing of amended certificates of incorporation and providing that nothing shall permit the insertion of any matter not in conformity with the law under which a corporation was organized, does not forbid the insertion in an amended certificate of incorporation of anything contained in the law

authorizing the consolidation of corporations enacted subsequent to the organization of the corporation.

4. Where the certificate of organization of a corporation and the stock certificates issued by it do not contain an express waiver of the power conferred on it by the statute authorizing corporations to consolidate, an abandonment of the power by the corporation will not be implied.

5. A proceeding for the consolidation of corporations is statutory and is directed finally by the corporate action by the entire body of stockholders, acting in their individual rights and interests, and, in the absence of any statutory disqualification of the directors to act by reason of common directorship in the merging companies, none can be created.

6. Individual stockholders are not trustees for each other, but each may, as a member of the general corporate body, exercise his individual right and vote equally with other stockholders on the ratification of a contract in which he is interested, subject to the qualification that the majority stockholders cannot so deal with the assets of the corporation as to divide them between themselves to the exclusion of the minority.

7. A consolidation agreement entered into by the directors of two corporations is neither void nor voidable at the election of a minority stockholder, merely on the ground that the directors making the agreement were the common directors of both corporations, or on the ground that the consolidation may be practically a sale to one of the corporations which is a majority stockholder of the other corporation.

8. The certificate of organization of a corporation and its stock certificates declared that preferred stockholders should be entitled to cumulative dividends, payable out of the net earnings of the company. The corporation sought to consolidate with another corporation as authorized by the act of 1893. Before attempting to consolidate it had failed to pay the preferred stockholders the prescribed dividend.—*Held*, that the right of the preferred stockholders to a continuance of future dividends as prescribed by the certificates would terminate by the consolidation, but the consolidation did not affect the right to the unpaid dividends.

9. The certificate of organization of a corporation and its stock certificates declared that preferred stockholders should be entitled to a cumulative dividend payable out of the net earnings of the company. The corporation was authorized to apply its surplus earnings to the acquisition of property, on such terms as the board of directors should determine, and neither the property so purchased nor any of the capital stock should be taken in payment or satisfaction of any debt, unless the majority of the board of directors or a majority of the stockholders should otherwise determine.—*Held*, that the certificates gave the corporation, through its directors, the power to use and apply to the purchase of property the surplus earnings while the corporation was a going concern, and on the termination of the corporation the earnings which had been accumulated and invested were subject to the charge in favor of preferred stockholders to whom dividends had not been paid.

10. Under Corporation act of 1896, as amended by laws of April 10th, 1902 (*P. L. 1902 p. 700*), providing that dissenting stockholders in cases of consolidation may have their stock appraised, the directors are bound

to propose an agreement which does not unfairly impair the legal or equitable right of a preferred stockholder, and he is not required to exercise any option of surrendering his stock on compensation until he has had an opportunity of joining in the consolidation under conditions which as to him are legal and equitable.

On motion for preliminary injunction.

Heard on bills and affidavits, answers and affidavits, and depositions in open court.

*Messrs. Pilney, Hardin & Skinner* and *Messrs. Eugene Hawkins & Lewis L. Delafield* (of the New York bar), for the complainants, James C. Colgate et al.

*Mr. Chauncey G. Parker* and *Messrs. Huntington, Rhinelander & Seymour* (of the New York bar), for the complainants, Robert A. Johnston et al.

*Mr. Richard V. Lindabury, Mr. Robert H. McCarter,* attorney-general, and *Mr. Edward M. Shepard, Mr. L. C. Krauthoff* and *Mr. William H. Harkness* (of the New York bar), for all of the defendants.

EMERY, V. C.

These two suits are brought to enjoin the consolidation of two corporations, the United States Leather Company and the Central Leather Company, both organized under the General Corporation act. The directors of the two companies have made the joint agreement prescribed by the one hundred and fifth section of the Corporation act (*Rev. 1896 p. 310*), and the meetings of the stockholders of each of the companies have been called pursuant to the statute, to consider and act separately on the agreement. An order temporarily restraining action on the agreement has been issued, and the meetings are adjourned, pending this application for preliminary injunction. The complainants in the two suits are all preferred stockholders in one of the companies, the United States Company, and do not appear

to be holders of common stock, and both suits are brought on behalf of themselves and others only as such preferred stockholders. The Central Leather Company is the principal owner of stock, both preferred and common, in the United States Leather Company, owning five hundred and sixty-three thousand three hundred and sixty-two of its total issue of six hundred and twenty-two thousand eight hundred and twenty-three shares of preferred stock (about ninety per cent.), and six hundred and five thousand three hundred and fifty-three of its total issue of six hundred and twenty-eight thousand eight hundred and twenty-three shares of the common stock (about ninety-six per cent.). The Central company was organized mainly for the purpose of acquiring the stock of the United States company, and as part of a plan for taking over the assets of the latter company and readjusting its stock, and its principal asset is the United States company stock, which constitutes nine-tenths or more of its entire property, at the valuations carried on its latest balance sheet. Nine directors of the United States company are all directors of the Central company, and compose the majority of the entire board of seventeen directors of the Central company, and the president, first, second and third vice-presidents, treasurer and secretary of the two companies are identical.

The complainants in the Colgate suit are the owners of twenty-two thousand seven hundred and fifty-three shares of the preferred stock, and in the Johnston suit of two thousand one hundred and fourteen shares—being together the holders of twenty-four thousand eight hundred and sixty-seven shares of the total fifty-nine thousand four hundred and sixty-one shares not owned by the Central company. Of this latter amount, however, other holders of shares have practically consented to the plan of consolidation, by coming in under an agreement, or plan, called the "plan of December, 1904," hereafter referred to, so that about ninety-four per cent. of the preferred stockholders have practically approved of the plan. Including the Central Leather Company, the holders of about ninety-eight per cent. of the common stock also approve, and the agreement is to be considered and acted on at the stockholders' meeting of the United States company by the entire body of stockholders of this com-

pany, the preferred and common stockholders voting under the act (section 105), as one entire body and not as separate classes of stockholders.

The preferred stock was issued under the provisions of an amended organization certificate, in which were the following clauses as to the respective rights of the holders of the preferred and common stock:

"That the preferred stock shall be entitled to a cumulative dividend of eight per cent. per annum, payable out of the net earnings of the company before any payment is made on the common stock, and in case of non-payment in full of any such yearly dividend, the portion unpaid shall be a charge without interest upon the earnings of the company prior to the claims of the common stock. In case of liquidation, the preferred stock shall be paid in full at its par, together with all earned and unpaid dividends, before any payment is made on the common stock. That the common stock is entitled to all dividends declared and payable out of the net earnings of the company after the dividends have been paid upon the preferred stock. In case of liquidation, the common stock shall be entitled to the entire assets of the company remaining after the payment in full at its par of the preferred stock then outstanding, together with all dividends thereon earned and unpaid."

These provisions were inserted in the preferred stock certificates, which, also in the form of the following contract, or agreement, fixed the date of the commencement of the dividend:

"It is mutually agreed between the holder hereof and the United States Leather Company, as follows: 'The preferred stock is entitled from and after the first day of May, 1893, to a cumulative dividend of 8 per cent. per annum,'" &c.

During no year since the issue of the preferred stock has the full dividend of eight per cent. been paid, and the dividends from January, 1905, have been six per cent. per annum. On January 1st, 1907, the accumulated unpaid dividends amounted to forty-five and eight hundredths per cent. By the proposed merger agreement each share of preferred stock (par value $100) is to be converted into a five per cent. gold bond for $50, preferred stock in the new company $50; with cumulative seven per cent. dividend and $23.50 in common stock of the new, or consolidated company. Each holder of common stock of the

United States company is to receive three-tenths of a share of the new company's common stock, but none of the bonds or preferred stock, and as between the two classes of stockholders of the United States company, the common stock of the new company, which comes to both classes together, (being about $33,501,040.50 of the entire issue of common stock of the new company, $40,000,000), is divided in the proportion of about $14,600,000 to the preferred stock, and $18,850,000 to the common, or about seven to nine.

The causes were argued together and the objections to the consolidation under the agreement involve the general questions: (1) Of the application of the merger acts to the United States company and its power to consolidate at all, or by any form of agreement, against the objection of any stockholder; (2) the effect of the provisions of the certificate of organization and stock certificate as giving to the preferred stockholder charter or contract rights which would be impaired by any consolidation, and must therefore be held to waive or abandon in their favor any such right, if the merger laws do apply to the company; (3) the character of the agreement, as being voidable at the option of any stockholder because it was made by companies having common directors, and made in violation of the trust relations of the directors, or of the Central company as majority stockholder, to the complainants as stockholders, and (4) the unfair and inequitable character of the agreement and the impairment of the substantial rights of the preferred stockholders, other than the Central company, for the benefit of the Central company, the principal common stockholder.

*First,* as to the lack of power in the company to consolidate at all in any manner without the consent of every stockholder. It is contended that such unanimous consent is necessary because the United States company was organized on February 25th, 1893, to continue for the term of fifty years, and before the passage of the general act of March 8th, 1893 (*P. L. p. 121*), authorizing consolidations. This act of March 8th, 1893, was not a supplement to the General Corporation act of 1875, but was an independent act, entitled "An act to authorize corporations incorporated under the laws of this state to merge and consolidate

their corporate franchises and other property," and it was extended to corporations (except railroad, canal, insurance and banking) organized, or to be organized, under any of the laws of the state, for the purpose of carrying on business of a similar nature, and took effect immediately. Similar provisions as to the consolidation of any corporations organized under any laws of the state for the purpose of carrying on similar business, were subsequently incorporated in the General Corporation act (Revision of 1896) (with the same exceptions), but this consolidation law of 1893 has not been repealed, and the power to consolidate depends upon the application of this act. It is insisted that a consolidation under an act passed after the organization of the company cannot be legally made against the consent of any stockholder, because it is in violation of the contract rights of the stockholder, created by the original certificate of organization, which was filed February 25th, 1893. To this claim of a stockholders' vested contract right, arising from and dating back to the original certificate and the time of its filing and the statutes then in force, the defendants answer that all of the preferred stock of the company was issued under an amended certificate of organization filed after the Consolidation act, and on May 2d, 1893; that the amended certificate created this preferred stock and defined its rights, and did not exclude the right of consolidation, and that all preferred stock, including complainants', was issued after the law of March, 1893. And it is insisted that as to the rights of stockholders to object to the exercise of the power of consolidation granted by the state after the organization, it is a vested right only in those stockholders who became such before the power to consolidate was given to the company, and that stockholders who become members of the corporation, by subscription to, or purchase of, its shares, after the increased powers are given, have no right to object to the company's subsequent exercise of these powers conferred previously to the time of their becoming members. Complainants' contention is based on the theory that the right to object to consolidation or a like material change which is authorized by a law passed after the original charter, is in the nature of a right of property inherent in or attached to the ownership of any

shares whenever issued, and follows the rights of the shares as fixed by the original charter until by unanimous consent of the stockholders the change has been accepted as, or has become, an amendment to the charter. The other view is that the right to object to the exercise of a power conferred upon the company subsequent to the charter is a separate and distinct personal equity which may be exercised and enforced by each owner of shares who is an owner at the time the power is conferred, and as to each share then existing (being the only ones who have the right to object) this personal equity terminates when they cease to be members, and does not follow to a transferee of their shares. On this theory, a purchaser of shares who becomes a member of the company after the power has been conferred has no standing to object. The precise point, viz., whether there is any difference in status between a purchaser of shares before or after the grant of the power of consolidation to the company, has not been authoritatively decided in this state. In every case in which hitherto the question has been decided as to the right of a company to exercise a power granted subsequent to the charter and the right was denied because it materially changed the status of the stockholders without their consent, the stock was, in fact, purchased or held before the passage of the subsequent act. So far, therefore, as any questions of right were involved in any such case, the rights of the stockholders were, in fact, the same as the rights under the original charter. The well-known cases, *Kean* v. *Johnson, 9 N. J. Eq. (1 Stock.) 401 (1853)* ; *Zabriskie* v. *Hackensack, &c., Railway Co., 18 N. J. Eq. (3 C. E. Gr.) 178 (1867)* ; *Black* v. *Delaware and Raritan Canal Co., 22 N. J. Eq. (9 C. E. Gr.) 130; Lowenthal* v. *Rubber Co., 52 N. J. Eq. (7 Dick.) 440 (1894)*, were all cases where the stock was purchased before the statute and action under it by the company was restrained as a violation of the contract right of the stockholder. *Rabe* v. *Dunlap, 51 N. J. Eq. (6 Dick.) 40 (1893)*, and *In re Newark Library Association, 64 N. J. Law (35 Vr.) 267 (1899)*, were similar cases, in which relief was denied after the company had acted on the amendment, because of the laches or assent of the stockholder complainant. *Brown* v. *Morton, 71 N. J. Law (42 Vr.) 26, 29 (1904)* ; *Meredith* v. *Zinc*

*and Iron Co., 59 N. J. Eq. (14 Dick.) 259 (1899)*; *Pronick v. Spirits Distributing Co., 58 N. J. Eq. (13 Dick.) 97 (1899),* and *Smith* v. *Eastwood, &c., Co., 58 N. J. Eq. (13 Dick.) 331 (1899),* which were cited on this point by complainants, involved only the construction of statutes existing at the time of the charter, and not the effect of subsequent statutes. In *New Jersey Midland Railway Co.* v. *Strait, 35 N. J. Law (6 Vr.) 322, 323 (Supreme Court, 1872),* the question arose between the consolidated company and a stranger, not a stockholder, agreeing to take bonds (see *p. 325*). Any expressions, therefore, in the opinions in any of these cases, that the rights of stockholders depended on the rights as declared in the original charters, cannot be considered as in themselves controlling authorities on the point now being considered, inasmuch as the question was neither involved, discussed or intended to be decided. And as to the decisions of our own courts, it must be further noted that where the time of purchase has been material, as being the act which constitutes the membership of a company (*e. g.,* in the case of mutual insurance companies by the taking out of a policy), our courts, in limiting the rights of such company to act under a law substantially increasing its powers, have been careful to limit the right to object to persons who were members before the law was passed. *Schwarzwaelder* v. *German Mutual Fire Insurance Co., 59 N. J. Eq. (14 Dick.) 589 (Court of Errors and Appeals, 1899).* In other courts, and in those of the highest authority, this precise question has, however, been raised and decided, these being cases where subscriptions to the stock of a company were made, and after the subscription the company was consolidated with another, under laws (either general or special) existing at the time of the subscription. Sometimes the subscriber, an individual, was sued by the consolidated company on his subscription and refused to pay the subscription, as being a material change in the terms of his contract, which was not binding without his consent. The subscribers were held liable, as being bound to accept the stock of the new company. The leading case is *Sparrow* v. *Evansville and Crawfordsville Railroad Co., 7 Ind. 369 (1856),* and Davidson, J. (*p. 373*), after saying "that the relation between the stock-

holder and the company is one of contract, and that any material change by legislative act, without his consent, is an invasion of his individual rights under the contract," further holds "that when defendant contracted (by subscribing for shares to the company) authority to consolidate existed, by a legislative act, which the companies had a perfect right to exercise, and of which he was then legally cognizant, and his contract, having been made under that law, must be presumed to have been made in reference to it, and cannot, therefore, be impaired by the law, because the law is part of the contract." This was a case where the original charter of the company whose stock was subscribed for was granted in 1849, before the act authorizing consolidation (February 6th, 1851), and the subscription to the stock was made in August, 1851, and after the act. In another class of cases, the subscriber, a municipal corporation, acting under legislative authority to subscribe to the stock of a specially named company after a vote or election and issue of bonds for payment, did so subscribe, and the company, having consolidated with another after the election or subscription, the stock of the consolidated company was received and bonds issued therefor. Their payment was afterwards contested on the ground that the municipal corporation could be liable only by virtue of statute, and being authorized to subscribe only for the stock of the original company existing at the time of the vote or election, had no right, after this subscription, and without another election under the statute, to accept stock of the consolidated company, a different company, and issue its bonds in payment. It was held in the latter class of cases that inasmuch as the power of the company to consolidate existed at the time of the subscription, the municipality had the right and was bound to take the shares of stock of the consolidated company. As to the validity of the municipal subscriptions and the liability on their bonds, there is a long line of decisions of the United States supreme court, commencing with *Nugent* v. *Supervisors, 19 Wall. 250,* and all collated in *Livingston County* v. *Portsmouth Bank, 128 U. S. 102 (1888).* In *Nugent* v. *Supervisors, supra,* Mr. Justice Strong says, that "In a multitude of cases decided in England and in this country, it has been determined that a

subscriber for the stock of a company is not released from his engagement to take it and pay for it by any alteration of the organization or purposes of the company, which, at the time the subscription was made, were authorized, either by the general law or by the special charter, and a clear distinction is recognized between the effect of such alterations and the effect to those made under legislation subsequent to the contract of subscription." And Mr. Chief-Justice Watts, in *Wilson* v. *Salamanca,* 99 *U. S. 499, 504,* says: "The power of the company to consolidate with other companies existed when the vote for subscription was taken in the township. When the consolidation (afterwards) took place, there was a perfected power in the township to subscribe to the stock of that company, and there was also an existing privilege in the company to receive the subscription. That power passed by the consolidation to the consolidated company."

The opinions in these cases, and in others following them, have led to the general incorporation in the leading text-books and digests, of the doctrine that a person subscribing for or purchasing· shares, cannot object to the subsequent exercise of a power to consolidate which existed in the company at the time· of his subscription or purchase. *1 Thomp. Corp.* §§ *343, 346; Noyes Intercor. Rel.* § *41* (at *p. 68*); *6 Am. & Eng. Encycl. L.* (*2d ed.*) *808.* This consensus of opinion on a point of corporation law, depending on general principles applicable everywhere, is entitled to very great weight in deciding upon the rule to be declared in this state, even if it should be thought that this general rule might not be based on sound principles. The advantages of having a rule on this aspect of the rights of shareholders similar to the general settled rule of the other states and of the United States courts, are in themselves reasons for its adoption. But I think that on principle, these decisions are sound. The basis for the·proper decision of the question will, I think, be reached when once we have precisely and correctly settled the legal origin and scope of the stockholder's right of objection. It originates, in my judgment, solely from the contract between the company, considered as a corporate entity, and the individual stockholder, and this being the· sole contract affected by the

power to consolidate, these two parties—the company and the individual stockholder—are the only parties directly interested, and each stockholder for himself alone deals with the company, and not with any or all of the other stockholders, in relation to his assent or dissent. Each is bound by his own action, or failure to act, and so far as relates to the mere exercise or exist-ence of the right to object, is not governed or controlled by the action of any other stockholder, or of all the others together, even if that action be taken at a meeting of the corporate body. In giving his assent to the consolidation he is under no obliga-tion to consider or obtain the concurrence of any other stock-holder, and when the assent is once given, it is final so far as affects his rights and cannot be withdrawn. *In re · Newark Library Association, 64 N. J. Law (35 Vr.) 265, 268.*

In states, as in Massachusetts, for example, where the amend-ment may be adopted by a majority vote of the corporate body (*Durfee* v. *Old Colony, &c., Railroad Co., 5 Allen 230*), the right of objection may be affected by and require such action at a corporate meeting, but .where, as with us, the theory of the shareholder's rights is that the right of individual objection be-longs to the stockholder as an individual, the amendment be-comes operative as to him, not because it has become part of the charter by corporate adoption, but because he individually has assented to the exercise of the power given by the legislature to the company. Each corporate body of stockholders has the right, in the present instance, by the statutory two-thirds vote to adopt the consolidation agreement, and thus for the first time as·a corporate body to act on and accept the law. Before acting under the consolidation laws no previous unanimous vote would be necessary to its acceptance by the corporate· body, but the acceptance by the statutory vote would be the only corporate action necessary, and this action would stand as sufficient corpo-rate action, unless prevented by a stockholder having the personal and individual right to object.

The original charter or certificate is, in some of its aspects, a contract between the stockholders *inter sese,* and it may be that a proposed agreement made under the Consolidation act would im-pair their rights *inter sese,* as fixed by the charter, to the assets

of the company, but this is an objection of another character, to be presently considered. The question now considered is whether any consolidation at all, on terms legally authorized, can be made against the objection of a stockholder who purchased his shares, not before, but after the act authorizing consolidation. In my judgment, the right to object to consolidation is an equity or right of a purely personal character, belonging only to the persons who were members or shareholders before the power to consolidate was given. The argument that unless the shareholder can transfer this right of objection with his shares, he is deprived of property, begs the question at issue, whether it is a property right, and as to this objection on its practical side, I think the court may well take judicial notice of the fact that the monetary value to the shareholder of the right to object would be greater on a sale made to extinguish the right than on a sale which merely transferred the right of objection to another. The highest value of the mere right to object, considered as "property," is always secured on its extinguishment.

On the question as to the status of a purchaser of shares after the Consolidation act, counsel in the Johnston case contend, also, that although the issue and purchase of the preferred stock under the amended certificate was in fact subsequent to the Consolidation act, yet it must by construction or relation be held to have been issued before that act. The reasons relied on are two—*first*, that the law of March 21st, 1893, authorizing the amendment of certificates, and under which the amendment was made, expressly provides "that the amended certificate shall take the place of the original certificate of incorporation and shall be deemed to have been recorded and filed on the date of recording and filing the original certificate." But the effect of the filing and recording of the original certificate is itself limited and defined by the statute in force at the time (*Corp. act 1875 § 13*) and is, that upon the making and filing the persons associating "shall be from the time of commencement fixed in said certificate, and until the time limited for the termination thereof, incorporated into a company by the name mentioned in said certificate," and as was said by Mr. Justice Dixon, in *Vanneman v. Young, 52 N. J. Law (23 Vr.) 403, 405 (Court of Errors and*

*Appeals, 1890*), the recording and filing are merely necessary evidence of the existence of the corporation. The retroactive effect of the filing of the amended certificate would cure defects in the original certificate, which had only been partially reached by the previous laws of March 25th, 1892, and March 29th, 1892 (*Gen. Stat. p. 960*), and probably confirm rights since acquired or attempted to be acquired, but it would unreasonably stretch the terms of this provision to consider it as operating by construction to deprive the corporation of the power which it had, at the time of the passage of the amendment law, to act under the consolidation law previously passed.

The *second* reason relied on for this objection, is that the *first* proviso to the act authorizing amendments is "that nothing shall permit the insertion of any matter not in conformity with the law under which such company was organized." It is said that this excludes the insertion in the certificate, either expressly or by implication, of any amendment or subsequent law. But in contemplation of law an act and its supplements are but one act or "law" for the purpose of construction (*Drew* v. *West Orange, 64 N. J. Law (35 Vr.) 481 (Supreme Court, 1900*), and if the Consolidation act, being a general law, is not to be considered as technically an amendment of the General Corporation law, then as the proviso refers only to the General Corporation law, it does not forbid the insertion in the amended certificate of anything contained in the consolidation or any other law relating to corporations in general, or prevent such law from being read into the certificate as an existing law.

Can there be any question that the amended certificate might lawfully have included an express provision that the company might consolidate, or could have declared the rights of the stockholders on dissolution by consolidation? The objections to the consolidation, so far as they are based on a denial of the application of the Consolidation act of 1893 and the right of the United States company to consolidate at all under this act against the objection of any shareholder purchasing after that act, must therefore be overruled.

The *second* question is whether the right of the United States company to consolidate under the act of 1893, has been restricted

or waived by the terms of the organization of stock certificates. There is no express waiver of this power conferred by the statute nor is there in the certificates any provision as to the stockholders' right, which requires for their enforcement or protection, the abandonment or restriction of this power to consolidate. A waiver or abandonment by implication of an express statutory power is not to be favored, and as the terms of the certificates do not either clearly or necessarily have this effect, this objection to consolidate is not sustained.

The *third* question raised is whether the consolidation agreement is voidable at the instance of any stockholder, either for the reason (1) that it was made by companies having common directors, or (2) because it was made in violation of trust relations toward the complainants as stockholders, existing on the part of the directors or of the Central company, as majority stockholder, controlling the election of directors and the management of the company. The principle allowing stockholders of a company or companies to avoid, on these grounds, agreements made by common directors of companies, reaches to and is intended to control those contracts of companies with each other in which the action of the common directors effects or concludes the contract and finally binds the company and all its stockholders. The avoidance of the agreement is an enforcement of the right of the company as a corporate body, which right of the company is asserted and prosecuted in its behalf by the individual stockholders in an action to which the company is a party, and in which the decree goes in favor of the company. The principle does not touch or apply to the control of the individual stockholders, voting or acting as such, in reference to their individual interests.

Contracts made on behalf of companies by common directors, or made by directors with one of their body, may be ratified by the corporate action of the entire body of stockholders, and where as in the merger acts, the final contract, if made, is the contract of the corporate body consisting of an entire body of stockholders acting as individuals, approving the agreement entered into by the directors, the principle does not apply. The whole proceeding for consolidation is statutory, and like pro-

ceedings for dissolution and some other proceedings, is directed finally to the corporate action by the entire body of stockholders, acting in their individual rights and individual interests, and in the absence of any statutory disqualification of the directors to act by reason of common directorship in the merging companies, none should be created by an appeal to a principle of equity, which was introduced to reach cases of an entirely different character. The only practical effect of applying the principle to these cases, would be to compel the introduction, as part of the machinery of consolidation, of the more objectionable feature of "dummy" directors in place of directors actually representing stockholders' interests. and entitled to the control or weight which properly belongs to majority interests.

The *second* reason for declaring the consolidation agreement voidable at the instance of any dissenting stockholder, is based upon an alleged trust relation which is supposed to exist on the part of the directors and of the Central company as the majority stockholder controlling their election and indirectly their action and to exist towards the minority stockholders as a body or individuals. Cases from other courts are cited in which apparently such doctrine of trust relationship is declared, but our own decisions do not recognize any trust relation of one individual stockholder or any combination of individual stockholders acting only in their individual rights toward any other stockholder or combination of stockholders.

The general rule under our decisions is, that the individual stockholders are not trustees for each other, but each may, as a member of the general corporate body, exercise his individual right and vote equally with other stockholders on the ratification of a contract in which he is interested, and ratification or adoption of the contract is valid, even if carried by his vote. *Hodge* v. *United States Steel Corporation (Court of Errors and Appeals, 1902).* I examined this question further in *Lillard* v. *Oil, Paint and Drug Co., 70 N. J. Eq. (4 Robb.) 197 (1903).* This right of the majority (statutory or other) either to originally direct or to affirm contracts or other proceedings in which the directors or the majority stockholders are interested, is not, however, absolute, but is subject to the necessary qualification

that the majority, although they may deal with the assets of the company, cannot so deal with them as to divide these assets, more or less, between themselves to the exclusion of the minority. *Lillard* v. *Oil, Paint and Drug Co., supra;* *Menier* v. *Hooper's Telegraph Works,* 9 *Ch. App.* 353 (1874). By this rule, full practical protection, and all the protection they are entitled to, is given to the minority stockholders without resort to any principle of supposed trust relationship of one individual stockholder or any combination of such individual stockholders, who constitute a majority, toward those who do not act with them and constitute a minority. To make the majority of the stockholders either directly or through their directors trustees of the minority, and obliged, because they are in a majority, to conduct the business or affairs of the company as, in any respect, the special trustees of the *minority,* seems to me to be a misconception of the theory of trust relations. The directors elected, as they must be, by a majority, become, when elected, the trustees, not of the majority or of the minority stockholders, but trustees of the entire body of stockholders whether belonging to the majority or minority. In *Chase* v. *Vanderbilt,* 62 *N. Y.* 307 (1875), this question as to the status of directors toward different stockholders or classes of stockholders arose, and Justice Miller said (*p. 315*): "As the directors are under the same obligation to all the stockholders they represent, they cannot be charged by a plaintiff in an action with the duty of specially caring for and protecting the interests of one class of stockholders as against the others." This theory that because directors were elected (as they must and should be) by the majority stockholders who control their action, they therefore become specially trustees of the *minority,* if logically followed out, would, as it seems to me, revolutionize the control of corporate bodies by removing it from the majority of the stockholders and imposing on the courts the necessity of controlling the business of the company by applying the rules and principles relating to trusts in the disputes concerning management arising wholly between different and shifting classes of stockholders.

My conclusion in reference to this objection is that the consolidation agreement is not either absolutely void or voidable at

the election of any stockholder merely for the reason that the directors making or controlling the agreement were the common directors of both the consolidating companies, or because the consolidation may be practically a sale to the Central company, the majority stockholder, but in view of the fact that the Central company controlled the making of the agreement, and will be the controlling stockholder on the adoption of the agreement, the question on this branch of the case, and in either aspect of it, is whether the terms of the agreement are such as will, more or less, substantially distribute or dispose of the assets of the United States company to the Central company, to the exclusion of the complainants and other objecting stockholders, or will distribute or dispose of them in such manner as to be either illegal, unfair or oppressive to the objecting stockholders.

*Fourth.* I come next to the question whether the particular agreement of consolidation proposed is, so far as the preferred stockholders are concerned, a legal agreement under the act, or does it, as to them, prescribe terms and conditions which illegally or inequitably change or affect their rights in the assets of the company which are proposed to be turned over to the new or consolidated company.

The act of 1893, in terms, authorizes the directors of the several corporations to enter into a joint agreement

"for the merger or consolidation of said corporation, and prescribing the terms and conditions thereof, * * * and the manner of converting the capital stock of each of said merging or consolidating corporations into the stock or obligations of such new or consolidated corporations."

This power to the directors to prescribe terms and conditions cannot, however, be held to be an unlimited, irresponsible power, but must be understood as authorizing only "lawful terms or conditions," and a lawful manner of conversion of the stock. The statute, for instance, provides only for the conversion of the stock of the existing companies into stock or obligations of the new company, but as to existing debts or obligations in the nature of debts of the merged companies, no power is given or attempted to be given to convert these into stock of the consoli-

dated company, and the merger act, on the contrary, expressly provides (section 4) that on the consolidation

"all debts, liabilities and duties of either of said former corporations shall thenceforth attach to said new or consolidated corporation, and may be enforced against it, to the same extent as if said debts, liabilities and duties had been incurred by it."

If, therefore, the consolidation agreement, as one of the conditions of converting the stock of any of the merging companies into the stock or obligations of the new company, should provide that a debt or liability of the existing company to the stockholder should, against his will or consent, be surrendered by him, it must, in my judgment, be held to be illegal under the act which provides that the debt, liability or duty is to continue.

Is, then, the obligation of the United States company to its preferred stockholders under its organization and stock certificates, a debt, liability or duty which, in any respect. or to any extent, continues against the consolidated company under the act? So far as relates to the right to terminate, by consolidation, the existence of the United States company, and the right to a continuance of future dividends, the question is to be answered in the negative, if my view as to the right to consolidate is correct. But this right to consolidate terminating, as it does, the right to future dividends after consolidation, does not necessarily affect the right to dividends existing at the time of consolidation, and it is in reference to the accumulated unpaid dividends that the question fairly arises as to whether, on the termination of the business of the company by the consolidation, the right to an account for the payment of them is not a liability or duty of the existing company, which would exist against the United States company on the termination of its existence, and which therefore continues against the new company.

As to these accumulated dividends, the language of the certificate is, that the preferred stockholders are entitled

"to a.cumulative dividend of eight per cent. per annum, payable out of the net earnings of the company before any payment is made on the common stock, and in case of non-payment in full of any such yearly

dividend, the portion unpaid shall be a charge without interest upon the earnings of the company prior to the claims of the common stock. In case of liquidation, the preferred stock shall be paid in full at its par, together with all earned and unpaid dividends, before any payment is made on the common stock. * * * The common stock is entitled to all dividends declared and payable out of the net earnings of the company after the dividends have been paid upon the preferred stock, and in case of liquidation the common stock shall be entitled to the entire assets of the company remaining after the payment in full at its par of the preferred stock then outstanding, together with all dividends earned and unpaid."

Dividends to the extent of about forty-five per cent. have accumulated and are unpaid. The surplus of the United States company, appearing on its books, is over twenty millions, and the bill alleges that this is available for the purpose of paying the accumulated dividends. The answer of the defendant companies asserts that of this apparent surplus only about seven millions arose from the earnings of the company, and that the balance of thirteen millions arose from the estimated increase of the value of the real estate acquired by the United States company at about the time of the commencement of its business in 1893, which estimated increase was made in the year 1903, and by raising the value of the companies' property, raised the surplus to that amount.

The affidavits and the evidence taken at the hearing show that the increase of valuation was not in the valuation of real estate, the title to which was in the United States company, but was an increase in the valuation of the stock held by the United States company in three subsidiary companies, which held the title to the real estate, and that the increase in valuation of the stock of these three companies, on the books of the United States Leather Company, was based on the increase in the valuation of the real estate owned by the subsidiary companies, which appeared on their books. Technically and strictly, therefore, the increase was in the valuation of the personal property of the United States company.

So far as this increased valuation of property enters into or forms part of the surplus, the United States company claims that no part of it has been actually realized or is properly or

legally available for dividends, and as to the seven millions of admitted earnings, which has been carried to the profit and loss account and so entered into the surplus account, it is claimed that no portion of this is available for, or chargeable with, the payment of the unpaid dividends, for the reason that under the authority of the organization certificate, it has been applied to the purchase of property for use in the conduct of its business, and therefore, under the General Corporation law, as it stood at the time of the amended certificate, and under the provisions of the certificate itself, no portion of it is applicable to the payment of any dividends, and it is further claimed that the company, during its continuance of business, not being liable to account for any portion of these earnings for dividend purposes, there is no right to any account for them on the termination of the business and the transfer of the assets by consolidation.

So far as the rights of the preferred stockholders in this case to call the company to an account for dividends of any kind out of the earnings or profits depend on the statutes or certificates, they seem to be as follows:

At the time of filing the amended certificate, the law in force as to the declaration and payment of dividends was the fifty-second section of the Corporation act of 1875 (*Rev. 1875 p. 186*) as amended by the act of March 17th, 1891 (*P. L. 1891 p. 176 ch. 106*) which provided

"that all manufacturing corporations shall * * * after reserving over and above their capital stock paid in, as a working capital for said corporation, a sum specified by their board of directors, and not exceeding the amount of one-half of the capital stock paid or secured to be paid, declare a dividend of the whole of their accumulated profits exceeding the amount so reserved as a working capital, and pass a share or dividend of each stockholder to the credit of their respective stockholders, and pay the same to such stockholders on demand; *provided, however,* that when such accumulated profits shall consist in part of real property or merchandise necessarily employed in the business of such corporations, the same shall not be regarded as profits for the purpose of the declaration or payment of such dividend, unless a majority of the board of directors or stockholders shall by resolution declare that all or some part of the accumulated profits which are invested in real estate or merchandise as aforesaid, shall be used as a part of the accumulated profits for the purpose of a dividend."

This statute seems to require the reservation for the special purpose of working capital, and of a specified sum, to be made by the directors, in order to relieve a manufacturing company from the liability to declare a dividend of the whole of its accumulated profits, but if such specific reservation had been made and it appeared that the accumulated profits consisted of property, real or personal, "necessarily employed in the business of such corporation," then, as I construe the statute, the stockholder claiming a dividend must further show that a majority of the directors or stockholders had by resolution declared that some part of the accumulated profits so invested should be used as part of the accumulated profits for the purpose of a dividend. The Corporation act (*Rev. 1896* § *118*) repealed the act of 1875 and all acts amendatory thereof, and by section 47 (*P. L. p. 293*) provided that

"the directors of every corporation * * * after reserving over and above its capital stock paid in, as a working capital for said corporation, such sum, *if any as shall have* been fixed by the stockholders, declare a dividend among its stockholders of the whole of its accumulated profits exceeding the amount so reserved, and pay the same to such stockholders on demand; *provided,* that the corporation may, in its certificate of incorporation or in its by-laws, give the directors power to fix the amount reserved as a working capital."

The provision of the amendment of 1891 as to the declaration of dividends where part of the surplus was invested in property was not re-enacted, and since the Revision of 1896, if applicable to the United States company, the whole power of reserving any portion of the profits or surplus from the payment of dividends seems to have been the power of the stockholders and not of the directors to reserve working capital.

It is claimed in this case that the United States Leather Company comes within the proviso of section 47, and that the amended certificate did confer upon the directors the power to reserve an amount for working capital, and also the additional power to invest this amount so reserved, in property, which was then not to be considered as part of the profits or earnings for the purpose of dividends. But, on carefully considering the terms of the amended certificate, I reach the conclusion, that

the power which was conferred on the directors by the clause relied on, was not the power to reserve working capital, but only the power to the directors to invest the amount which had been reserved "according to law."

The clause in question is in the article (third) creating the stock, and is as follows:

"That the company may use and apply its surplus earnings or accumulated profits authorized by law to be reserved, to the purchase and acquisition of property, and to the purchase and acquisition of its own capital stock from time to time, and to such extent and in such manner and upon such terms as its board of directors shall determine, and neither the property nor the capital stock so purchased or acquired, nor any of the capital stock taken in payment or satisfaction of any debt to the company, shall be regarded as profits for the purpose of the declaration or payment of dividends, unless a majority of the board of directors or a majority of the stockholders shall otherwise determine."

The whole scope of this clause, as I construe it, is to give the company, through its directors, and to such extent and in such manner, and upon such terms, as its board of directors determine, power to use and apply to the purchase of property, and specially of its own stock, *the surplus earnings or profits authorized by law to be reserved.* It was not a power to the directors to reserve from working capital, but a power to the directors to use and apply, at their discretion, for specified purposes, the profits authorized to be reserved by law, and the use presupposed and depended on a previous reservation of the capital "authorized by law." At the time of filing the certificate, the directors and not the stockholders were in fact authorized, within certain limits, to reserve the working capital, but the clause "authorized to be reserved by law" in the certificate is not to be construed as meaning authorized only by law as existing at the time of the certificate and excluding subsequent laws authorizing or changing the power of reservation. And, in my judgment, the subsequent law of 1896, directing the reservation, if any, of working capital, to be by the stockholders and not by the directors, is applicable to the United States Leather Company. When the reservation is so made then the directors, under this clause of the charter, if it has now any application, have the power to use

the amount so authorized by law to be reserved, in the purchase of property, and especially of its own stock, and if so invested, it is not to be regarded as profits for the payment of dividends, unless a majority of the directors or stockholders so determine.

In the present case there does not seem to have been any formal reservation of profits for working capital, either by the directors or stockholders, and even if the question as to the right to have dividends declared out of the earnings were raised by proceedings against the directors of the company as a going concern, there might be some question whether, in the absence of such formal reservation of working capital by either the directors or stockholders, the mere fact that the accumulated profits were invested in property would be a sufficient answer to the claim for declaration of dividends under the statute. But this clause in the certificate was, in my judgment, intended to apply to and regulate only the declaration and payment of dividends by the company, as a going concern, and is not to be held to affect or control the right of the preferred stockholder, on the termination of the business of the company by dissolution otherwise than by liquidation, to the earnings of the company which had been accumulated and invested for the continuance of its business, and which, while being accumulated and invested, were subject to this express charge in his favor. In other words, this clause of the certificate should not, in the absence of express language, be construed as relieving the earnings from the express charge created on them for the unpaid dividends, except as to the extent manifestly intended by the whole scope of the clause, viz., a power or discretion given to the directors in the management of the business and for its continuance. As to such earnings, so invested, I think the clause of the certificates (both organization and stock) applies, that as to the dividends, "The portion unpaid shall be a charge without interest upon the earnings of the company, prior to the claims of the common stock." In case of liquidation, this preference for the payment of all earned and unpaid dividends is expressly declared in connection with the preferential payment in cash of the par value of the preferred stock. But the provision that the charge for the unpaid dividends is upon the earnings "prior to the claim of the

common stock," includes, in my judgment, and so far as the unpaid dividends are concerned, a priority to any claims of the common stock in any contingency and as well on dissolution by consolidation as in any other contingency not specified.

This obligation of the company to pay the unpaid dividends out of its earnings, before the claims of the common stock, and the express charge upon the earnings, prior to the claims of the common stock, is not an obligation which makes the preferred stockholder a technical creditor of the company and the holder of a debt of the company, but it does, in my judgment, create a liability or duty of the company to pay the unpaid dividends out of the earnings of the company, if any exist, before either these earnings or any of the property of the company representing them is distributed to the holders of the common stock by the consolidated agreement. It is proposed by the agreement to give each holder of one share of the common stock of the United States company, three-tenths of a share of the common stock of the new company, and of the total amount of the new common stock (about $32,000,000) the common stockholders receive $18,000,000 and the preferred stockholders about $14,000,000. And the unpaid dividends being expressly charged upon the earnings of the company, these earnings, or the property or assets of the company representing them, or in which they have been invested, will, in my judgment, be taken over by the consolidated company (which takes all the assets of the United States company), subject to the liability or duty to account for these earnings or the property in which they have been invested, thus taken over for the payment of the accrued dividends and to the extent to which the earnings applicable to dividends have been unpaid. Such accounting, of course, would be subject to the payment, or provision for payment, of such debts or obligations of the company as are, in their nature, prior to any rights of any stockholder, preferred or other.

If this construction as to the rights of the preferred stockholders to a preference on the earnings of the company as they existed at the time of the consolidation, for the unpaid dividends, be correct, and this claim is one in the nature of a claim for liability or duty of the company, then the preferred stock

holders have, on the termination of the business by the consolidation, the right to an account for at least so much or such proportion of the apparent surplus as represents net earnings, and which is admitted to be about one-third, and the provision in the consolidation agreement requiring the surrender of the shares without any reservation of the right to pursue the new company for this alleged debt or liability of the former company, renders the proposed agreement illegal as against any person who declines to consent. The option should be given to the preferred stockholder by the agreement itself to surrender the shares without waiving this claim, and if any portion, of the stock of the new company is proposed to be given to the preferred stockholder in satisfaction of this claim for accrued dividends, the option should be given to accept this stock, or to reserve the right to pursue the new company for the alleged liability.

In the proposed agreement (article 4) each holder of the preferred stock is required to surrender his shares duly endorsed in blank for transfer, upon which he is to receive securities of the Central Leather Company, and for every share of preferred stock, to receive $50 par value twenty years five per cent. gold bonds, $50 par value seven per cent. cumulative preferred stock, and $23.50 in par value of common stock. The surrender of stock, as I take it, is to be made to the Central Leather Company, and, of course, carries with it any claim for unpaid dividends. The common stock, $23.50, is not expressed to be given in lieu of or as representing the claim for unpaid dividends, but on the argument it was so treated by counsel on both sides, and the fairness of this apportionment as a business proposition was attacked by the complainants and supported by the defendants. But in view of the nature of the claim to accrued dividends, the decision of the court, in reference to the inequitable character of the agreement, is not dependent on the question of fairness or advisability of the offer of $23.50 of the common stock as a business proposition. If the offer or tender is an offer for the settlement of a claim against the United States Leather Company, which is clearly in the nature of a liability or duty of that company, and which, if not surrendered, would continue as such

against the new company, under the statute, then the preferred stockholder is entitled to exercise his own judgment in reference to the settlement of the claim, and cannot be required to submit to the judgment of the court as to whether the offer or tender, considering all the circumstances, is a fair one on the consolidation. And, as I have said above, the option should be expressly reserved to him by the agreement of surrendering, with his shares, the right to the unpaid dividends for the consideration tendered therefor, or to reserve the right to pursue the consolidated company for its payment upon its taking over the assets.

In reference to the effect on these suits for injunction of the provisions of the law of April 10th, 1902 (*P. L. p. 700*), amending the Corporation act of 1896 and providing that dissentient stockholders, in cases of merger or consolidation, may have their stock appraised, my conclusion is, that the directors are bound, under the Consolidation act, to propose an agreement which does not unfairly or inequitably impair the legal or equitable right of any preferred stockholder, and that such stockholder cannot be required to exercise any option of surrendering his stock on compensation, until he has had an opportunity of joining in the consolidation "under terms and conditions" which, as to him, are legal and equitable. Any other construction or application of this act relating to proceedings for condemnation would leave it altogether in the power of the statutory majority of the stockholders to compel the sale of the stock of dissentient stockholders by the device of imposing terms so illegal or inequitable that consent would be neither contemplated nor given.

For the same reason no effect can be given to the offer, by stipulation filed in the cases and made by the answers, to give the same compensation as on liquidation. Until legal terms and conditions are proposed, complainant cannot be required to exercise any option. And in reference to this offer, I make the additional comment, that unless the offer contains a statement of the price or valuation at which the assets are taken over by the new company, and whether the valuation of the assets is to be more, less or the same as the capitalization of the new com-

pany, the basis for determining the value. as upon liquidation cannot be ascertained without litigation to determine the meaning and scope of the offer.

As the proposed consolidation agreement, for the reasons stated, inequitably affects the rights of the preferred stockholders in relation to the accumulated dividends upon their stock, I conclude that its execution must be enjoined.